**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-4768**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LORENE CHITTENDEN,

Defendant – Appellant.

---

**No. 14-4828**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LORENE CHITTENDEN,

Defendant – Appellant.

---

**No. 15-4226**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LORENE CHITTENDEN,

        Defendant – Appellant.

------

**No. 15-4659**

------

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

LORENE CHITTENDEN,

        Defendant – Appellant.

------

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, District Judge.  (1:12-cr-00394-LO-4)

------

Argued:  October 28, 2016               Decided:  January 31, 2017

------

Before GREGORY, Chief Judge, and KEENAN and FLOYD, Circuit Judges.

------

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Keenan and Judge Floyd joined.

------

**ARGUED**:  Joseph Ray Pope, WILLIAMS MULLEN, Richmond, Virginia, for Appellant. Christopher John Catizone, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF**:  John S. Davis, WILLIAMS MULLEN, Richmond, Virginia, for Appellant.  Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

------

GREGORY, Chief Judge:

On May 7, 2014, a jury found Appellant Lorene Chittenden guilty of one count of conspiracy to commit bank fraud and mail fraud and ten counts of bank fraud for her role in originating and submitting fraudulent mortgage loan applications. Chittenden appeals on several grounds, including that the government's pretrial seizure of her assets violated her Sixth Amendment right to counsel, that the government failed to present sufficient evidence on the conspiracy and bank fraud counts, and that the district court lacked jurisdiction to enter the post-trial forfeiture orders. Finding no error, we affirm.

I.

Chittenden worked as a loan officer at George Mason Mortgage ("GMM") in Fairfax, Virginia from June 1999 to April 2008. The superseding indictment alleged that in this role Chittenden joined a conspiracy to submit mortgage loan applications with false information, and that in doing so she defrauded Cardinal Bank, a federally insured institution. Count 1 charged that between 2002 and 2007 Chittenden conspired with four codefendants, five named coconspirators, and other conspirators known and unknown to commit bank fraud and mail fraud in violation of 18 U.S.C. § 1349. The government also charged Chittenden with twenty-two individual counts of bank fraud in violation of 18 U.S.C. § 1344.

Contemporaneous with the superseding indictment, the government moved ex parte for a restraining order to preserve Chittenden's property for potential forfeiture. The district court granted the motion, finding that "[a]ll assets of the defendants, including

3

substitute assets" were subject to pretrial restraint.  J.A. 80.  The district court made one exception, however—it denied the government's request to recover $40,000 that Chittenden had already paid to her attorneys from the law firm Williams Mullen, the same attorneys who defended her in the trial court and represent her in this appeal.

Chittenden ultimately proceeded to a seven-day trial that centered on her role in preparing loan applications for first-time, Hispanic homebuyers.  Beginning in 2005, Chittenden worked on applications for "stated loans" (commonly referred to as "liar loans"), *see* J.A. 1074, which borrowers generally obtained by listing their income and asset figures without any independent verification by lenders.  The government argued at trial that, among other things, Chittenden submitted stated loan applications replete with false income, asset, and employment information, and that she undertook these acts in concert with multiple realtors.

The central figure in the charged conspiracy was Rosita Vilchez, the head of Vilchez & Associates, a residential real estate company.  As Chittenden recognizes, the testimony at trial showed that Vilchez and her company were "steeped in fraud."  Appellant's Br. 13. Vilchez, for instance, would direct her employees to give money to the company's clients so the clients had the minimum amount of funds needed to qualify for certain loans (and then later ordered employees to reclaim the money).  J.A. 154-55.  For the same purpose, Vilchez directed employees to add borrowers to their own personal bank accounts.  J.A. 153.  Vilchez and her associates also obtained fraudulent "CPA letters" from tax preparation companies to support borrowers' loan applications; these letters falsely stated

4

that the borrowers were self-employed and that the companies had prepared tax returns on their behalf. *See* J.A. 155, 470-71, 646-48.

Over the course of the trial, the government presented testimony from twenty-seven witnesses, including more than a dozen borrowers and several realtors who had worked with Chittenden on those borrowers' loan applications. The defense called eight witnesses, including Chittenden. Chittenden moved for a judgment of acquittal, but the trial court denied the motion and submitted the case to the jury. The jury convicted Chittenden on the conspiracy count and on ten counts of bank fraud, and acquitted her on four other bank fraud counts.[1]

On the evening before Chittenden's October 3, 2014 sentencing hearing, the government filed a motion for a preliminary order of forfeiture, seeking a money judgment against Chittenden. At the hearing, Chittenden argued that the government's motion was untimely under Federal Rule of Criminal Procedure 32.2(b)(2)(B), which provides that "[u]nless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)."

In large part due to the government's delay, the district court neither made any forfeiture findings at the sentencing hearing nor entered any forfeiture orders. The district court instead proceeded to other aspects of Chittenden's sentence, imposing a term of forty-two months' imprisonment. The parties did, however, discuss the forfeiture issue at the

---

[1] Although the government charged Chittenden with twenty-two individual bank fraud counts, only fourteen were submitted to the jury. *See* J.A. 1746-50.

hearing, and the court referenced forfeiture near the close of the hearing: "I will not impose a fine and costs in light of the restitution and the forfeiture order that may take assets that you presently possess." Sentencing Transcript, October 3, 2014 ("Sent'g Tr.") 42.[2] The written judgment entered later that day also included the following notation: "FORFEITURE – TO BE DETERMINED." J.A. 1757.

Because the district court had sentenced Chittenden without imposing the forfeiture penalty, the government filed a motion to amend or correct sentence pursuant to Federal Rule of Criminal Procedure 35(a). The government suggested that the court remedy this omission by entering a forfeiture order within the fourteen days allowed under Rule 35(a). The district court did not follow this suggestion. Instead, it directed counsel to schedule an evidentiary hearing on the government's forfeiture motion. The district court also stated in a written order that its earlier judgment "is amended to clarify that it was only a partial judgment order—as it did not include the mandatory forfeiture order—and therefore is not yet final." J.A. 1829.

Over Chittenden's objection that the district court lacked jurisdiction to amend her sentence, the parties litigated the forfeiture issue for the next year. The district court issued an order in March 2015 granting in part and denying in part the government's motion for a preliminary order of forfeiture. The district court subsequently entered a money judgment against Chittenden for $1,513,378.82, the amount of the conspiracy proceeds that

---

[2] Even though the parties did not provide the sentencing transcript in the Joint Appendix, we may review and rely on it since it is part of the district court record. Fed. R. App. P. 30(a)(2) ("Parts of the record may be relied on by the court or the parties even though not included in the appendix.").

it deemed was reasonably foreseeable to Chittenden. The government eventually obtained a forfeiture order for Chittenden's substitute property up to the amount of $1,032,378.82. The government filed a motion for reconsideration, which the district court denied on October 13, 2015, just over a year after Chittenden's sentencing hearing.

Chittenden timely appealed the district court's order of October 13, 2015.

II.

Chittenden first claims that the government's pretrial seizure of her assets violated her Sixth Amendment right to counsel. Because Chittenden failed to raise this argument below, it is subject to plain error review. Chittenden must therefore demonstrate that an error was made, the error was plain, the error affected her substantial rights, and the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Hare*, 820 F.3d 93, 104-05 (4th Cir. 2016). We need not proceed past the first step of the plain error analysis here as Chittenden has failed to establish any Sixth Amendment error.

As noted, the district court allowed the government to restrain Chittenden's assets, tainted or untainted. Prior to this restraint, Chittenden had hired attorneys from Williams Mullen to conduct a preindictment investigation, whom she retained during trial and throughout the sentencing proceedings. Chittenden states that due to the pretrial restraint she had to borrow money from family members to pay her legal fees, and because she could not pay her attorneys throughout the lengthy post-trial proceedings, she amassed a considerable debt. In the wake of the Supreme Court's decision in *Luis v. United States*,

7

136 S. Ct. 1083 (2016) (plurality opinion), Chittenden contends that the government violated her right to counsel, requiring reversal of the judgment below.

In *Luis*, a four-member plurality held that the government's "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Id.* at 1088. It was undisputed that the district court's order there barred the defendant from using her untainted funds—that is, funds unconnected to the alleged crime—to "hire counsel to defend her in her criminal case." *Id.* Consistent with this denial, the Supreme Court repeatedly spoke of the Sixth Amendment right in terms of the right to choose one's counsel. *See, e.g.*, *id.* at 1093 (stating that "[a]s far as Luis' Sixth Amendment right to counsel of choice is concerned"). The Court reaffirmed that deprivation of the right to counsel of choice is a structural error. *Id.* at 1089 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006)).

Chittenden's right to counsel of *choice* is simply not implicated here. Chittenden retained at trial multiple attorneys from Williams Mullen—the same firm she chose to conduct a preindictment investigation. Chittenden was not forced to change her privately retained attorneys or to rely on appointed counsel. As Chittenden's (chosen) counsel conceded at oral argument, nothing in the record indicates that she wanted different attorneys. Given that the pretrial seizure of funds did not prevent Chittenden from "being represented by the lawyer[s] [s]he want[ed]," *Gonzalez-Lopez*, 548 U.S. at 148, we reject

8

her claim that the government violated her Sixth Amendment right to counsel of choice.[3]
*See also United States v. Gordon*, 657 F. App'x 773, 778 (10th Cir. 2016) (denying defendant's Sixth Amendment claim under *Luis* where "he, in fact, had retained counsel of his choice") (citing *United States v. Gordon*, 710 F.3d 1124, 1139 (10th Cir. 2013)).

In sum, we find no Sixth Amendment error.

## III.

Chittenden next claims that the government failed to present sufficient evidence to support her conspiracy conviction.

Defendants face a "heavy burden" when bringing sufficiency challenges. *United States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013) (quotation omitted). This Court must sustain the jury's verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942).

---

[3] Chittenden also asserts that, because she was denied access to her untainted assets, she was barred from preparing her preferred defense and her attorneys were limited during discovery in violation of the Sixth Amendment. Appellant's Supp. Br. 6. Chittenden relies on *Luis* in making this argument, but as discussed above, she was not denied her counsel of choice. Although Chittenden does not frame her argument as such, to the extent she is claiming that the government's pretrial restraint impaired the effectiveness of her chosen counsel, she has failed to explain with particularity how her defense was limited. *See United States v. Gordon*, 710 F.3d 1124, 1139 (10th Cir. 2013) (rejecting claim that pretrial restraint of defendant's property violated Sixth Amendment where defendant's "counsel remained fully and actively engaged" and defendant failed to "identify any concrete facts that would explain what was actually done in preparation for his defense and what additional steps his counsel would have taken, if [the defendant] had not been denied access to his funds"). There is no indication that Chittenden's defense was hampered in any way—quite the opposite, Chittenden retained two or three attorneys before, during, and after trial who, based on our review of the record, represented her aggressively.

Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Jaensch*, 665 F.3d 83, 93 (4th Cir. 2011) (quotation omitted). Reversal on insufficiency grounds is appropriate only where "the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17 (1978).

To convict a defendant of conspiracy under 18 U.S.C. § 1349, the government must prove that two or more people agreed to commit an unlawful act, and that the defendant willfully joined the conspiracy with the intent to further its unlawful purpose. *See United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999); *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014). The government charged Chittenden with conspiracy to commit bank fraud and mail fraud.[4] Once the government proves the existence of a conspiracy, it need only show a "slight connection" between the defendant and the conspiracy to obtain a conviction. *United States v. Burgos*, 94 F.3d 849, 861 (4th Cir. 1996) (en banc) (quotation omitted). It is the "settled law of this circuit" that the "testimony of a defendant's

---

[4] The elements of mail fraud under 18 U.S.C. § 1341 are "(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme." *United States v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001) (quotation omitted). A defendant may commit federal bank fraud in one of two ways. The elements of bank fraud under 18 U.S.C. § 1344(1) are "(1) the defendant knowingly executed or attempted a scheme or artifice to defraud a financial institution, (2) he did so with intent to defraud, and (3) the institution was a federally insured or chartered bank." *United States v. Adepoju*, 756 F.3d 250, 255 (4th Cir. 2014). The "requirements for a § 1344(2) conviction differ only as to the first element, which is that the defendant knowingly execute a scheme to obtain property held by a financial institution through false or fraudulent pretenses." *Id.* The government charged Chittenden under both § 1344(1) and 1344(2).

accomplices, standing alone and uncorroborated, can provide an adequate basis for conviction." *United States v. Burns*, 990 F.2d 1426, 1439 (4th Cir. 1993).

As a threshold matter, the parties contest the scope of the conspiracy charged in the indictment. Chittenden argues that the indictment alleged a "hub and spoke" conspiracy in which Vilchez was the "hub" and the other conspirators (such as Chittenden, Rocio Benavides, and J. David Levy) were the "spokes." Appellant's Reply Br. 2. From this understanding, Chittenden asserts that the government was limited to showing that Chittenden was a "spoke connected to the unitary Vilchez Conspiracy," *id.* at 4—that is, that she conspired with Vilchez herself or individuals employed at Vilchez & Associates at the relevant times. The government rejects the notion that the conspiracy charged in the indictment focused exclusively on Vilchez and Vilchez & Associates. Taking a broader view of the indictment, the government argues that it could show Chittenden's involvement in the charged conspiracy by linking her to any of the other coconspirators named in the indictment, not just Vilchez or those that worked at her company.

Looking to the language of the indictment, we adopt the government's view of the charged conspiracy. The "Manner and Means" section of the indictment, for example, states that "the defendants and their co-conspirators *would and did submit* and direct Vilchez & Associates employees to submit fraudulent loan documents that materially misstated" borrowers' information. J.A. 32 (emphasis added). This language indicates that the government could prove the conspiracy by showing Chittenden and her

11

coconspirators agreed to submit fraudulent applications, regardless of Vilchez's or her employees' involvement.[5]

With this understanding of the scope of the conspiracy in place, we now consider whether the evidence, viewed in the light most favorable to the government, was sufficient to support the jury's verdict on the conspiracy count.

As is common in these cases, much of the government's evidence came from coconspirator testimony. The coconspirator testimony here, if credited, established that Chittenden was aware of her coconspirators' unlawful practices and of the conspiracy. Coconspirator Rocio Benavides, a realtor during the charged conspiracy, testified that Chittenden discussed CPA letters with Vilchez, telling Vilchez that they could not use the letters for every application because "the underwriter won't believe it." J.A. 158. Benavides also testified that she discussed CPA letters and the practice of adding clients to bank accounts with Chittenden. J.A. 174, 207, 209. When asked on cross-examination why she added a particular borrower to her account, Benavides responded that Chittenden "needed to show more assets. And I asked her, can I add this client into my bank account. And she said, yeah, that's fine." J.A. 209.

The coconspirators and borrowers also provided key testimony concerning Chittenden's participation in the conspiracy, namely her preparation of applications that

---

[5] Additionally, Chittenden's suggestion that the conspiracy revolved solely around Vilchez and Vilchez & Associates is undercut by her acknowledgement that the indictment included "seven overt acts that nowhere mentioned Vilchez or her business, but rather involved [coconspirators Rocio] Benavides and [J. David] Levy," after they had left Vilchez & Associates. Appellant's Br. 11; *see* J.A. 53-63.

12

contained false information. Benavides collaborated with Chittenden on applications, and she described their working relationship. After receiving the applications from Chittenden, Benavides would have the borrowers sign them and would fill in their biographical information, but would leave the borrowers' income and asset information blank. J.A. 162-63. Benavides would then return the applications to Chittenden. Chittenden never asked Benavides for the borrowers' income information.

Benavides closed three loans with Chittenden, and each of the three borrowers testified that their applications contained false information. Alma Reyes, one of the borrowers, testified that she had signed the application but had not provided the employment or income information contained therein. J.A. 245-46. Her application stated that she made $7,450 per month, when in fact she earned approximately $16,000 or $17,000 per year. J.A. 246, 1461. The last page of Reyes's application also included a note—which Reyes did not write and confirmed was false—that stated Reyes owned a business: "I work [at] Chick Fila [sic] as my day job. I also own my cleaning company and work evening[s] and weekends there. My manager runs my business when I am not there. I have 8 people who work for me." J.A. 1463.

Critically, when Chittenden took the stand, she testified that she had inputted the income and employment information on Reyes's application, and had written the explanatory note. *See* J.A. 1079-1082; *see also* J.A. 1082 (confirming explanatory note was in her handwriting). Chittenden claimed Benavides provided her with the information.

Reyes's loan application was just one of several that Chittenden worked on that contained false employment, income, and/or asset information, and where realtors and

13

borrowers testified they had not filled in (or provided Chittenden or anyone else with) that information. *See, e.g.*, J.A. 542, 569, 612-13, 621, 626-27, 655, 709, 719-20, 730. The jury could have reasonably—indeed, easily—concluded from this evidence that Chittenden knew of an agreement to submit fraudulent loan applications and supporting documentation, and that she knowingly and willfully participated in it by, among other things, supplying false information in the applications. Considering that Chittenden's connection to the conspiracy needed only to be slight, the testimony of the realtors and borrowers, coupled with the applications themselves, provided more than sufficient evidence of Chittenden's guilt.

Even adopting Chittenden's limited view of the conspiracy, the government introduced sufficient evidence linking Chittenden and Vilchez. Chittenden originated loans for Vilchez herself, in which Vilchez's monthly income varied widely. Benavides also overheard Vilchez and Chittenden discussing fraudulent activities. Benavides testified that Vilchez told Chittenden on the phone, "I'm sending you the bank statement right now. Did you get it?" J.A. 159. Chittenden responded to Vilchez over the speakerphone: "Rosie, stop using that bank account because the underwriter already knows that account number." J.A. 159. Finally, named coconspirator Rolando Ponce, a Vilchez & Associates employee during the conspiracy, testified that, at Vilchez's direction, he visited Chittenden to collect a $10,000 check that was to be deposited to inflate a client's bank account. J.A. 639-40.

Chittenden asks us to discredit much of the coconspirator testimony as unreliable. She notes that Benavides spoke limited English, and asserts that Benavides could not

14

possibly have recognized Chittenden's voice over the phone or recalled conversations all these years later. But it is not our role to reweigh the evidence or second-guess the jury's credibility determinations. *United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007). Our role is to draw all reasonable inferences and assume that the jury resolved any inconsistencies in the government's favor.

Having done so, we conclude that the government presented substantial evidence such that a reasonable jury could find Chittenden guilty of conspiracy to commit bank fraud and mail fraud. We therefore affirm the conspiracy conviction.

IV.

Chittenden also seeks reversal of her conspiracy conviction because of the trial court's allegedly flawed evidentiary rulings.

We "review evidentiary rulings for an abuse of discretion, affording substantial deference to the district court." *United States v. White*, 810 F.3d 212, 227 (4th Cir. 2016). If the district court erred in admitting evidence, the error is subject to harmless error review, as per Federal Rule of Criminal Procedure 52(a).

Chittenden challenges multiple pieces of evidence concerning an application prepared for a borrower named Zenaida Linares ("Linares Loan evidence"). Chittenden first challenges the admission of hearsay statements from Francisco Ramos, a realtor who worked for named coconspirator Levy. The government introduced Ramos's statements through Levy's testimony. According to Levy, Ramos stated that he had discussed

15

fraudulent activity with Chittenden related to Linares's application; Ramos further said that he had set up a meeting between Linares and a tax preparation company.

Chittenden also challenges the admission of a fax cover sheet that the government introduced through Linares's testimony. The fax cover sheet concerned the preparation of fraudulent tax returns to support Linares's loan application. The cover sheet indicated that a fax had been sent from Ramos to Chittenden with the subject line, "Zenaida Linares" and a "Notes" section that read, "These are tax returns 2005[,] 2006." J.A. 1531.

Chittenden claims that the district court erred by admitting Ramos's statements (which include the fax cover sheet) under the coconspirator exception to the hearsay rule.[6] Fed. R. Evid. 801(d)(2)(E). To admit a statement pursuant to this exception, the offering party "must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy." *United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001). These preliminary questions are to be resolved under a preponderance standard of proof. *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992). In deciding these factual questions, a court is "not precluded from examining the out-of-court statements sought to

---

[6] Chittenden also objects to the fax cover sheet on prejudice grounds under Federal Rule of Evidence 403. She says that she never received the fax cover sheet and argues that because the fax cover sheet lacked a fax stamp (or path or header) at the top of the document, Ramos likely fabricated the document. Even if Chittenden's hypothesis is true, the court did not err in admitting the document. As we have recognized, a document's unreliability is not a proper reason for exclusion under Rule 403. *Rainey v. Conerly*, 973 F.2d 321, 326 (4th Cir. 1992). Such credibility determinations are precisely the type we leave to the jury. *Id.*

be admitted; the court may consider those statements in conjunction with other evidence."

*Id.*

Chittenden zeroes in on the second factual question—she contends that the government failed to show that she and Ramos were members of the same conspiracy, thereby precluding admission of the Linares Loan evidence. We find otherwise. Unchallenged testimony from Levy and Linares established that Ramos worked for Levy and was engaged in fraudulent activity with respect to loan applications, both Ramos and Chittenden worked on Linares's application, that application contained false information, and Linares unknowingly signed amended tax returns. Levy also testified that fifteen days after Linares's loan closed, he received a call from Chittenden regarding the Linares loan and tax forms; Levy understood Chittenden to be saying that if the loan was submitted without the proper tax forms, the IRS "will find about it." J.A. 461.

Put simply, the testimony at trial established that both Chittenden and Ramos had worked on the Linares application, which contained false information, and had ties to fraudulent activities with Levy. It was reasonable for the district court to conclude from this evidence, in conjunction with the out-of-court statements themselves, that it was more likely than not that Chittenden and Ramos were coconspirators. This is especially so considering that individuals need not even know each other to be part of the same conspiracy. *United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir. 1995). As such, we

conclude that the district court did not abuse its discretion by admitting Ramos's statements pursuant to the coconspirator exception to the hearsay rule.[7]

But even if the district court had erred in admitting the challenged evidence, the error would have been harmless. To find an evidentiary error harmless, we must be able to "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Ibisevic*, 675 F.3d 342, 350 (4th Cir. 2012) (quotation omitted).

Given the substantial testimonial and documentary evidence showing Chittenden's connection to the charged conspiracy, we can say with "fair assurance" that the admission of the Linares Loan evidence did not affect the jury's verdict on the conspiracy count. As discussed above, the government introduced ample evidence of Chittenden's awareness of and participation in the conspiracy. This evidence included testimony from Benavides and Levy describing the practice of sending blank, signed applications to Chittenden; testimony from borrowers who confirmed that critical information on those applications was false; the loan applications themselves; testimony from Chittenden describing how she filled in loan applications; testimony from Benavides describing her discussions of fraudulent

---

[7] We reject Chittenden's suggestion that the district court erred in finding Ramos's statements were made in furtherance of the conspiracy. A coconspirator's statement is made in furtherance of the conspiracy if "it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994). The statement need not be "exclusively, or even primarily, made to further the conspiracy" as long as there is "some reasonable basis" for finding it was intended to further the conspiracy. *Id.* at 444 (quotation omitted). Chittenden offers no serious argument that Ramos's statements concerning the Linares loan do not meet this standard.

18

activity (such as adding clients to bank accounts) with Chittenden; testimony from Benavides and Ponce describing Chittenden's ties to Vilchez's fraudulent activities; and applications that Chittenden originated for Vilchez.

In light of this overwhelming evidence, we are confident that the jury's verdict "was not substantially swayed by" the admission of the Linares Loan evidence. Chittenden classifies the challenged evidence, particularly the fax cover sheet, as "devastating," noting that the government emphasized it in its closing argument. Appellant's Br. 37. She stresses the documentary nature of the fax cover sheet and how it corroborated Levy's testimony. But this overstates the importance of the Linares Loan evidence; that loan was but one of many the government argued Chittenden had submitted with false information. The Linares Loan evidence had nothing to do with Benavides, for instance, and the documentary evidence consistent with her extensive testimony.[8] And while it is true that the government discussed the contested evidence in its closing statement, the government methodically walked through numerous pieces of additional evidence.

In short, we find that the district court did not err in admitting the Linares Loan evidence, but even if it had, the error was harmless.

---

[8] *See* J.A. 1325 (government stating in closing argument that the "testimony of Rocio Benavides too is strongly corroborated by the documents and evidence" and referencing Exhibit 7-D).

19

V.

Turning to the bank fraud convictions, Chittenden contends that the government failed to produce sufficient evidence that she violated either subsection of the federal bank fraud statute, 18 U.S.C. § 1344. The statute provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1)    to defraud a financial institution; or
>
> (2)    to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

The two subsections of § 1344 "proscribe slightly different conduct, but a person may commit bank fraud by violating either [one]." *United States v. Brandon*, 298 F.3d 307, 311 (4th Cir. 2002). The government charged Chittenden under both subsections, alleging that she knowingly executed a scheme to defraud Cardinal Bank, a federally insured financial institution, and that she obtained the bank's property by means of fraudulent loan applications to the bank's wholly owned subsidiary, GMM. The government introduced evidence at trial that when GMM issued loans, the loans were funded from an existing line of credit with Cardinal Bank. J.A. 405.

With respect to § 1344(2), Chittenden argues that the government failed to prove she obtained Cardinal Bank's property "by means of false or fraudulent pretenses, representations, or promises." We disagree. The Supreme Court has clarified that the "by means of" requirement is satisfied when the defendant's "false statement is the mechanism

20

naturally inducing a bank (or custodian of bank property) to part with money in its control."
*Loughrin v. United States*, 134 S. Ct. 2384, 2393 (2014). Chittenden's false and fraudulent statements here—the mortgage loan applications—were the mechanism that naturally induced Cardinal Bank to part with its money. The loan applications caused GMM to issue the loans, which in turn triggered Cardinal Bank to supply funds from its existing line of credit with GMM.[9] *See United States v. Irvin*, 682 F.3d 1254, 1272-73 (10th Cir. 2012) (sustaining § 1344(2) conviction where "loan proceeds disbursed from [subsidiary] upon its decision to fund [a borrower's] mortgage indisputably came from the credit line extended to it by [the parent bank]").

Reading *Loughrin* broadly, Chittenden asserts that the government cannot satisfy the "by means of" requirement because the actual false or fraudulent statements—the loan applications, in this case—never "made their way to Cardinal Bank." Appellant's Br. 44. But *Loughrin* does not establish an absolute rule that the false statement must reach the federally insured bank in all cases. Rather, as explained above, the key inquiry is whether the false or fraudulent statement naturally induces a bank to part with its property. And as the Supreme Court has further explained, the "by means of" language "calls for an inquiry

---

[9] In her third letter pursuant to Federal Rule of Appellate Procedure 28(j), Chittenden argues that she did not violate § 1344(2) because the government failed to prove that she knew the property came from a federally insured entity. Chittenden did not raise this argument with respect to § 1344(2) in her opening brief and therefore it is waived. *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 604 n.4 (4th Cir. 2010) (holding that argument not raised in opening brief is waived). In any event, a jury could have easily inferred from Chittenden's extensive experience as a loan officer and her decade working at GMM that she knew that submitting loan applications would influence a federally insured institution and involve bank property.

21

into the directness of the relationship between means and ends" and "will depend almost entirely on context." *Loughrin*, 134 S. Ct. at 2394 n.8. Here, the context plainly shows a close and direct relationship between the means (submitting fraudulent loan applications to bank's subsidiary) and the ends (receiving bank property when bank supplies funds for loans through line of credit with its subsidiary).

Accordingly, we decline to disturb the bank fraud convictions as the government supplied sufficient evidence for a jury to convict Chittenden under § 1344(2). Because we reach this conclusion with respect to § 1344(2), we need not consider whether the bank fraud convictions can be independently affirmed under § 1344(1). *See Brandon*, 298 F.3d at 314 (declining to engage in sufficiency analysis under § 1344(2) where conviction upheld under § 1344(1)).

## VI.

In a separate challenge to her bank fraud convictions, Chittenden argues that the government constructively amended the indictment in violation of the Fifth Amendment. A constructive amendment, often referred to as a fatal variance, occurs when the government "through its presentation of evidence and/or its argument . . . 'change[s] the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (quoting *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991)). If the government's proof and/or argument does not alter the crime charged, however, then the change is classified as a "mere variance." *Id.* A mere variance does not infringe an

22

individual's constitutional rights "unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." *Id.* We review claims of constructive amendment de novo. *United States v. Allmendinger*, 706 F.3d 330, 339 (4th Cir. 2013).

Chittenden asserts that because the indictment repeatedly states that she "caused Cardinal Bank to grant a [] mortgage loan," *see, e.g.*, J.A. 74, when in fact the evidence at trial showed that GMM granted the loans, a fatal variance occurred and reversal on the bank fraud counts is warranted. Not so. Chittenden was not convicted of an offense different than the one charged in the indictment—as explained in the prior section, the government sufficiently proved that Chittenden fraudulently obtained Cardinal Bank's property in violation of § 1344(2). Even though GMM granted the loans, it drew upon its line of credit with Cardinal Bank to fund the loans.

To the extent the government's imprecise language concerning which entity granted the loans constitutes a mere variance, Chittenden fails to address how she was prejudiced. As such, we reject Chittenden's argument that the government constructively amended the indictment.

## VII.

Chittenden next turns her attention to the post-trial proceedings, specifically asking us to vacate the forfeiture orders. She claims that the district court's failure to include forfeiture as part of the October 3, 2014 sentence and judgment rendered it without jurisdiction to do so at a later date.

23

Criminal forfeiture is an aspect of a defendant's sentence, *Libretti v. United States*, 516 U.S. 29, 38-39 (1995), and it is mandatory for a defendant convicted of bank fraud. *See* 18 U.S.C. § 982(a)(2) (noting that in imposing a sentence on a person convicted of violating or conspiring to violate § 1344 the court "*shall* order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation" (emphasis added)). The procedures governing criminal forfeiture are outlined in Federal Rule of Criminal Procedure 32.2.

Chittenden contends that the district court violated the Rule 32.2 requirements, sentenced her on October 3, 2014, without imposing the forfeiture penalty, and failed to properly use either Federal Rule of Criminal Procedure 35 or Rule 36 to modify her sentence to include forfeiture. From these premises, Chittenden argues that the district court lacked jurisdiction to enter the preliminary and final forfeiture orders months after the October 3, 2014 sentencing and judgment.

Even assuming (without deciding) that all of Chittenden's premises are true, we conclude that the district court had jurisdiction to later enter the preliminary and final forfeiture orders against Chittenden. In *United States v. Martin*, 662 F.3d 301 (4th Cir. 2011), this Court considered a district court's failure to enter the preliminary and final orders of forfeiture until after sentencing and judgment. We concluded that Rule 32.2(b)(3)[10] was not a "jurisdictional condition," but rather, borrowing language from the

---

[10] The *Martin* court considered Rule 32.2(b)(3) as it existed at the time of the appellant's sentencing. The rule was subsequently modified in 2009.

24

Supreme Court's decision in *Dolan v. United States*, 560 U.S. 605 (2010), should be understood as a "time-related directive." *Martin*, 662 F.3d at 308. The Court went on to hold that "missing [a] deadline set in Rule 32.2 does not deprive a district court of jurisdiction to enter orders of criminal forfeiture so long as the sentencing court makes clear prior to sentencing that it plans to order forfeiture." *Id.* at 307.

Because Chittenden was "on notice at the time of sentencing that the district court would enter forfeiture orders," the district court retained jurisdiction to do exactly that. *Id.* at 309-10. When the parties were selecting a date for a sentencing hearing, Chittenden's counsel reminded the court that the government intended to seek forfeiture. J.A. 1441 ("Your Honor, there is a notice of forfeiture in the indictment."). The court heard the parties' arguments on the forfeiture issue at that hearing, where the government reminded the court that "[t]he rule says that the Court *shall* order forfeiture." Sent'g Tr. 30 (emphasis added). Apart from the jurisdictional objection, Chittenden's counsel acknowledged at sentencing that Chittenden was subject to the forfeiture penalty. Sent'g Tr. 27 ("I certainly agree that the Government is entitled to forfeiture in an amount that includes the joint and several liability for foreseeable conduct of co-defendants"). And the district court referenced a forthcoming forfeiture order at the close of the hearing when it stated it would "not impose a fine and costs in light of the restitution and the forfeiture order that may take assets that you presently possess." Sent'g Tr. 42. The district court further indicated in its

25

written judgment that forfeiture was to be determined.[11] Given this unique combination of facts, we conclude that Chittenden had notice that the district court would order the mandatory forfeiture.

Accordingly, under *Martin*, the district court had jurisdiction to enter the preliminary and final forfeiture orders after the October 3 hearing.[12]

VIII.

Chittenden brings one final challenge to the post-trial forfeiture proceedings. Chittenden does not contest that she is liable for the approximately $1.5 million forfeiture amount. She instead contends that the government should not be able to collect approximately $1 million of that amount by seizing her substitute property. The core of Chittenden's argument is that her coconspirators' acts of dissipating, commingling, or transferring the conspiracy proceeds—which provided the basis for the court's substitute property order—cannot be attributed to her.

---

[11] We also note that the district court provided Chittenden's counsel seven days to brief the forfeiture issue and there appeared to be an understanding among the parties that the forfeiture amount would be taken up at a later date. *See* Sent'g Tr. 32, 43; *see United States v. Ferrario-Pozzi*, 368 F.3d 5, 10 (1st Cir. 2004) ("Failing altogether to discuss forfeiture at the sentencing hearing is not the same, however, as purposefully postponing further elaboration on the topic . . . .").

[12] To be clear, although the district court retained jurisdiction here, the court's decision to proceed with Chittenden's sentencing hearing on October 3, 2014 created substantial confusion and additional litigation. The best practice would have been to postpone the hearing until a time when all aspects of Chittenden's sentence could have been imposed at a single time.

26

It is well-established that a defendant "is vicariously liable for the reasonably foreseeable conduct of his co-conspirators, both substantively and at sentencing." *United States v. Bollin*, 264 F.3d 391, 422 (4th Cir. 2001). This Court has applied these vicarious liability principles in the criminal forfeiture context. *United States v. McHan*, ("*McHan I*") 101 F.3d 1027, 1043 (4th Cir. 1996). A conspiracy defendant's criminal forfeiture liability is not limited to property that he or she derives individually; rather, a defendant is "jointly and severally liable for the forfeiture of proceeds from a conspiracy." *United States v. Jalaram, Inc.*, 599 F.3d 347, 351 (4th Cir. 2010). Additionally, under the substitute assets provision, contained at 21 U.S.C. § 853(p), courts *must* order the forfeiture of substitute property "when the tainted property has been placed beyond the reach of a forfeiture." *United States v. McHan*, 345 F.3d 262, 271 (4th Cir. 2003) ("*McHan II*").

The district court correctly applied these principles here. It entered a money judgment against Chittenden for $1,513,378.82, the amount of conspiracy proceeds that was reasonably foreseeable to Chittenden. The court later determined that $1,032,378.82 of those proceeds was beyond the reach of the government, finding that Chittenden's co-conspirators had dissipated, commingled, or transferred that amount. Because the district court determined that those funds were unavailable, it properly authorized the government to seek Chittenden's substitute property up to that amount. *See McHan II*, 345 F.3d at 268 (reiterating, in a conspiracy case, that if "forfeitable property cannot be located by the government . . . the court must, pursuant to § 853(p), order the forfeiture of 'substitute property' of the defendant up to the value of the forfeitable property"); *Bollin*, 264 F.3d at

27

422 (noting that as a member of a conspiracy, defendant's "substitute assets [] may be subject to forfeiture in the event the laundered funds are determined to be unavailable").

Chittenden objects to the district court's reliance on her coconspirators' acts. She argues that their acts of making unavailable the conspiracy proceeds should not be attributed to her because those acts were not within the scope or in furtherance of the conspiracy. Chittenden, in essence, proposes a rule whereby the government can only seize a conspiracy defendant's substitute assets if the conspirators agree to dissipate, comingle, or transfer the proceeds of a conspiracy after its completion.

Chittenden, however, provides no authority to support the application of vicarious liability principles in this manner. Indeed, as the district court recognized, Chittenden's proposed rule makes little sense—the dissipation, commingling, or transfer of funds will almost never be within the scope or in furtherance of a conspiracy. And such a rule would run counter to Congress's explicit instruction to "liberally construe[]" the forfeiture statute "to effectuate its remedial purposes." 21 U.S.C. § 853(o).

Accordingly, we reject Chittenden's challenge to the district court's substitute property order.

IX.

For the foregoing reasons, the judgment is

*AFFIRMED.*

28