**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-4311

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JONATHAN N. PINSON,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Columbia. David C. Norton, District Judge. (3:12−cr−00974−DCN−1)

Argued: October 25, 2016                        Decided: June 19, 2017

Before AGEE, DIAZ, and THACKER, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published per curiam opinion. Judge Diaz wrote a dissenting opinion as to Parts II.A. and IV.

**ARGUED**: William Walter Wilkins, NEXSEN PRUET, LLC, Greenville, South Carolina, for Appellant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF**: Kirsten E. Small, NEXSEN PRUET, LLC, Greenville, South Carolina, for Appellant. Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William N. Nettles, United States Attorney, J.D. Rowell, Assistant United States Attorney, Jane B. Taylor, Assistant United States Attorney, Tommie D. Pearson, Assistant United States

Attorney, Nancy C. Wicker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

———————

PER CURIAM:

Jonathan Pinson appeals his convictions for conspiracy to participate in a racketeering enterprise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), government program theft, honest services fraud, mail and wire fraud, money laundering, and making false statements to federal agencies. He argues that there was insufficient evidence for a jury to convict him, and also contends that the district court constructively amended the original indictment, necessitating a new trial.

We conclude that there was insufficient evidence to support Pinson's convictions for RICO conspiracy and government program theft, and accordingly vacate those convictions and remand for resentencing. In all other respects, we affirm.

I.

A.

This case arises out of Pinson's various business relationships and ventures from 2006 to 2012, including a diaper business (Supremes, LLC), a real estate development company (Village at River's Edge or "VRE"), a consulting business (Noel Group, LLC), and an investment company (Brixstone Group, LLC). During this time, Pinson also served on the Board of Trustees of South Carolina State University ("SCSU"), a state-supported school. The charges focus on Pinson's involvement with four ventures: (1) SCSU's homecoming concert; (2) SCSU's purchase of a luxury resort; (3) Supremes, LLC's private diaper business; and (4) VRE's real estate project. We summarize each venture in turn.

3

1.

## The Homecoming Concert

SCSU's annual homecoming concert had suffered from poor attendance in the past. In mid-2010, one of Pinson's closest friends, Eric Robinson, introduced him to concert promoter Willie Joy. After discussing promotion of the 2010 Homecoming concert with Robinson and Joy, Pinson contacted his friend Edwin Givens, who served as SCSU's General Counsel. Both Givens and Pinson persuaded other University officials to meet with Joy and Robinson about hiring them to promote the 2010 Homecoming concert. Their efforts, however, did not succeed because the University had already selected a promoter for 2010.

In 2011, Pinson and Givens tried again to get SCSU to hire Joy and Robinson and this time, succeeded. Joy and Robinson's company, W.E. Entertainment, began contract negotiations with SCSU in mid-2011. In August 2011, W.E. Entertainment signed a concert promoter contract with SCSU, where W.E. would receive $12,500 upon signing, $12,500 on the day of the concert, and 40% of concert profits. Givens signed the contract on the University's behalf.

Joy and Robinson had separately agreed to share any concert profits with Givens and Pinson. Additionally, both Givens and Pinson expected to get a portion of the $12,500 signing payment. Joy refused to share the signing payment, but Robinson gave $500 cash to Givens in an envelope outside a hotel. In September 2011, Pinson texted Robinson with his bank account information, and Robinson went on to transfer $500 to

4

Pinson's account as well. The concert took place on October 7, but did not generate a profit.

2.

Sportsman's Retreat

Around this time, SCSU also considered buying a new off-campus retreat facility. Michael Bartley, Chief of Police at SCSU, knew both Pinson and Richard Zahn, a Florida developer who owned a luxury resort in South Carolina called "Sportsman's Retreat." After Zahn put Sportsman's Retreat up for sale, Bartley took various SCSU officials to view the property, including the University President. Bartley also encouraged Pinson to meet with Zahn.

Zahn invited Pinson, Bartley, and others to Florida for entertainment at Zahn's expense, and afterwards talked to Pinson over the phone about doing various business deals together. Zahn told Pinson he would sell Sportsman's Retreat for below its appraised value, and discussed how to guide University officials through the sale. Both Bartley and Pinson expected a commission in exchange for helping with the sale; for example, Zahn testified that Pinson asked him for a Porsche Cayenne. Pinson tried persuading University officials to buy the property but told Bartley that he would recuse himself when the Board of Trustees voted on the matter. Pinson also asked Givens for help in facilitating the transaction, promising him some funds from the sale. On October 31, 2011, at Pinson's request, Givens sent a letter to Zahn indicating SCSU's intent to purchase Sportsman's Retreat. Ultimately, SCSU did not purchase the property.

5

3.

Supremes, LLC

Outside his involvement in the University, Pinson helped manage a diaper business called Supremes, LLC. The prior owner of the business, Collin Brown, had struggled to make a profit. In 2008, Brown met with Robinson, who eventually introduced him to Pinson and businessmen Robert Williams and Lance Wright. Together, the group planned to relocate the business to Marion County, South Carolina and revitalize it.

To help with the relocation, Pinson met with Marion County officials to obtain a state or federal grant. In exchange for the jobs expected to be brought to the area, the County agreed to help fund the retrofit of an aging commercial building that the County owned, so that it could be used by Supremes, LLC as a diaper factory. In September 2009, the County signed a grant award and performance agreement with Supremes, LLC and the South Carolina Coordinating Council for Economic Development ("CCED"), which provided the money. The grant prohibited using the funds for payroll, manager bonuses, owner repayment, or for compensating state or federal officials. Wright persuaded a colleague named Phillip Mims to serve as project manager for the retrofit. Mims's job was to receive the invoices from the contractors, and package and submit them to the County.

Mims and Williams testified that they, Pinson, and Wright repeatedly submitted inflated or false invoices to Marion County for work not actually completed. Some of this money went directly to Mims's company, PDM Management, while other funds were

6

issued to the Noel Group, a company owned by Pinson. Neither PDM Management nor the Noel Group, however, did any significant work on the retrofit. As a result of these false invoices, Marion County (using the grant money it received) sent a $62,100 check to the Noel Group. Pinson in turn sent checks ranging from $5,000 to $10,000 to Mims, Williams, and Wright from the Noel Group's bank account.

4.

Village at River's Edge

Finally, Pinson also helped manage a housing development known as the Village at River's Edge. In 2006, Pinson and another business partner had purchased a tract of land for VRE in Columbia, South Carolina. After the other partner sold his interest, Wright and Williams invested in VRE.

VRE soon began talks with the Columbia Housing Authority ("CHA"), a local quasi-governmental agency which provides subsidized housing to low-income residents. CHA had just received a $10 million federal grant from the Department of Housing and Urban Development. In 2010, VRE contracted with CHA to build numerous housing units, 60 of which would be owned by the Authority. Under the contracts, CHA agreed to provide $5.6 million in construction costs and a $381,000 developer's fee from its federal grant money to VRE. Mims served as a project manager for VRE, which also hired a company named SK Builders to actually build the units. VRE submitted a monthly pay application to CHA on a federal housing grant form documenting overall expenses, so that CHA could send VRE payments. VRE, in turn, was required to pay SK Builders for its work.

7

In 2011, SK Builders started work and began submitting invoices to VRE. Pinson and Mims, on behalf of VRE, submitted numerous pay applications to CHA on the federal form, certifying that VRE had paid subcontractors for their work. Of the funds VRE received from CHA, some were wired to Pinson's personal account or withheld from SK Builders. After a period of complaints, SK Builders contacted CHA directly and threatened a work-stoppage; when CHA contacted Pinson about the issue, he admitted that he had "juggled" funds and promised to make catch-up payments. Ultimately, CHA began paying SK Builders directly, and while the project was eventually completed, SK Builders was never paid in full.

B.

A grand jury returned an indictment charging Pinson with the following crimes under Title 18 of the United States Code: (1) conspiracy to engage in racketeering (RICO conspiracy) in violation of § 1962(d); (2) theft from government programs in violation of § 666; (3) extortion in violation of § 1951; (4) honest services fraud in violation of § 1346; (5) mail and wire fraud in violation of §§ 1341, 1343; (6) money laundering in violation of §§ 1956, 1957; and (7) false statements in violation of § 1001. The government relied on statements and evidence provided by many of Pinson's colleagues, including Williams, Mims, Zahn, Bartley, and Givens, who testified in exchange for lesser sentences.

During a two-week jury trial, the government presented evidence from these witnesses and University employees, F.B.I. agents, and other government officials, as well as records of Pinson's financial transactions. The evidence also included records of

8

Pinson's phone calls and text messages, obtained through a federal wiretap conducted from July to November 2011. Pinson then moved for a judgment of acquittal, which the district court denied. Following four days of deliberations, the jury convicted Pinson on Counts 1 (RICO conspiracy), 2 and 3 (government program theft), 12 and 18 (honest services fraud), 25-34 (mail and wire fraud), 35-41 (money laundering), and 43-46 and 48-50 (false statements). Robinson, Pinson's co-defendant, was acquitted of all charges. The court sentenced Pinson to sixty months' imprisonment on each count to run concurrently, and ordered him to pay $340,743.02 in restitution and penalties. [1]

This appeal followed.

II.

Sufficiency of the Evidence

Pinson first challenges the district court's denial of his motion for a judgment of acquittal, a decision we review de novo. *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015). In considering Pinson's challenge to the jury's verdict, we view the evidence in the light most favorable to the government. *United States v. Barefoot*, 754 F.3d 226, 233 (4th Cir. 2014). Through this lens, we must sustain a conviction if the record contains "substantial evidence," that is, "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Chittenden,* 848 F.3d 188, 195 (4th Cir. 2017)

---

[1] Pinson does not challenge his sentence proceeding or his sentence in this appeal.

9

(quoting *United States v. Jaensch*, 665 F.3d 83, 93 (4th Cir. 2011)). Although this standard presents a "heavy burden," reversal is appropriate if "the prosecution's failure is clear." *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).

After reviewing the record, we find sufficient evidence to support Pinson's convictions for honest services fraud, mail and wire fraud, money laundering, and false statements. We are not so persuaded as to Pinson's convictions for RICO conspiracy and government program theft, and therefore vacate them.

A.

RICO Conspiracy

We first consider Pinson's RICO conspiracy conviction. Pursuant to 18 U.S.C. § 1962(d), to prove a RICO conspiracy, evidence must show the existence of a RICO "enterprise" in which the defendant conspired to participate, and that the defendant conspired that a member of the enterprise would perform at least two racketeering acts constituting a "pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997); *United States v. Cornell*, 780 F.3d 616, 621 (4th Cir. 2015) (quoting *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012)). Although such "conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part" of a racketeering act, each conspirator must share "the same criminal objective." *Salinas*, 522 U.S. at 63–64.

A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). It includes not only legal entities but also "any union or group of individuals

10

associated in fact." 18 U.S.C. § 1961(4). Nevertheless, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

To prove "a pattern of racketeering activity," the evidence "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Racketeering acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (internal quotation marks omitted). To constitute or threaten continued criminal activity, racketeering acts may either be closed-ended, i.e., "a closed period of repeated conduct," or open-ended, i.e., naturally "project[ing] into the future with a threat of repetition." *Id.* at 241–42.

Here, we conclude that the evidence did not establish a single conspiracy, a RICO enterprise encompassing all four ventures, or a pattern of racketeering activity. *See Salinas*, 522 U.S. at 62; *Cornell*, 780 F.3d at 621. The government's failure is thus clear, and we vacate Pinson's RICO conspiracy conviction. *See Chittenden*, 848 F.3d at 195.

1.

Pinson and His Associates Did Not Conspire to Commit the Same Crimes

To begin, as noted, a conspiracy consists of "partners in [a] criminal plan" who "agree to pursue the same criminal objective." *Salinas*, 522 U.S. at 63–64. At best, the evidence here shows two separate conspiracies, one involving the VRE and Supremes

11

ventures and another involving the homecoming concert and Sportsman's Retreat. In each conspiracy, only two members (including Pinson) conspired to commit the criminal acts, and Pinson is the only member who overlaps both conspiracies. In the VRE venture, Pinson and Mims fraudulently obtained grant funds, but Wright and Williams were mere passive investors. The false invoices involved in the Supremes venture inculpated Wright and Williams along with Pinson and Mims. But the conspiratorial tie between the Supremes and VRE ventures boils down to just two members: Pinson and Mims.

Likewise, the membership of each SCSU-related venture only overlaps by two: Pinson and Givens. To be sure, the homecoming concert also implicated Robinson to some extent by virtue of the kickbacks he gave to Pinson and Givens, and Robinson participated in the Supremes venture by introducing Brown to Pinson, Wright, and Williams. But this innocuous introduction does not draw Robinson into the criminal element of that venture.

Therefore, Pinson is the only member common to all four ventures. As a result, we cannot say that the government proved a single conspiracy in which each conspirator shared "the same criminal objective." *Salinas*, 522 U.S. at 63–64. Although conspirators need not know the full scope nor membership of a conspiracy, nor need they participate in all of its activities, they must at least have a "single-mindedness to achieve a particular goal." *United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005). On the contrary, the cast of characters here was of at least two minds, if not more.

## 2.

### Pinson and His Associates Did Not Form a RICO Enterprise

For much the same reasons that the evidence in this case is insufficient to prove a single conspiracy, it is also insufficient to prove an association-in-fact enterprise consisting of "a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583. The purpose of each venture here was to enrich its members, yet any fruits of these ventures accrued only to members of each venture. Any illicit profits did not carry over to the members of the other ventures. Indeed, given the lack of overlapping members between the ventures, any such profits *could not* carry over.

To be sure, a RICO enterprise need not have a rigid structure and its members may "engage in spurts of activity punctuated by periods of quiescence," but it must at least consist of "an ongoing organization" that "function[s] as a continuing unit." *Boyle*, 556 U.S. at 945, 948 (quoting *Turkette*, 452 U.S. at 583). Quite the reverse, the four ventures here involved different memberships, methods, and motives, and thus lacked the "common purpose" and relationships among its associates necessary to establish a RICO enterprise. *Id.* at 946 (quoting *Turkette*, 452 U.S. at 583).

## 3.

### The Predicate Racketeering Acts Did Not Form a Pattern of Racketeering Activity

The government similarly failed to prove a pattern of racketeering activity. The lack of conspiratorial overlap among the four ventures weighs against a pattern of racketeering activity just as it does a RICO enterprise. *Cf. Turkette*, 452 U.S. at 583

13

("While the proof used to establish these separate elements may . . . coalesce, proof of one does not necessarily establish the other."). The evidence thus fails to show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239.

First, the racketeering acts here lack the requisite relationship to constitute a pattern of racketeering because they do not bear common "distinguishing characteristics" and are instead "isolated events." *H.J. Inc.*, 492 U.S. at 240. Their purpose was to enrich Pinson and his associates, yet those very associates were not involved in each venture, much less in each underlying racketeering act. Further, the nature of the racketeering acts varied along the same line separating the conspiracies: in the VRE and Supremes ventures, the conspirators misappropriated grant funds, while the SCSU-related ventures involved abusing public positions. This dividing line highlights the fact that Pinson was the only common thread among all four ventures.

Second, the racketeering acts neither constituted nor threatened a degree of "continued criminal activity" sufficient to establish either closed- or open-ended continuity. *H.J. Inc.*, 492 U.S. at 239. The VRE venture lasted around two and a half years, from "July or September of 2009," J.A. 240,[2] when Wright and Williams invested in the project, until November 2011, when Pinson submitted the final pay application and law enforcement sent VRE members target letters and interviewed them. The Supremes venture lasted less than a year, beginning on June 24, 2009, the incorporation date for

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

14

Supremes, LLC, and continuing until January 2010, when Pinson drew checks from the Noel Group bank account for Mims, Williams, and Wright. The Sportsman's Retreat venture also lasted less than a year, beginning in December 2010, when Zahn met SCSU officials in Florida, and ending around October 31, 2011, after Givens sent Zahn the letter of interest. The homecoming concert venture also lasted approximately one year, beginning around June 2010 when Robinson and Pinson met Joy, and concluding on October 7, 2011, the date of the concert.

Thus, even viewing these separate ventures together, they spanned from June 2009 until November 2011, amounting to a period of around two and a half years. These fragmented schemes do not reveal a "scope and persistence" that "pose[s] a special threat to social well-being." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)). Indeed, we have required much greater closed-ended time periods to establish a pattern of racketeering activity. *See, e.g.*, *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 550–51 (4th Cir. 2001) (holding fraudulent conduct lasting 17 months did not establish closed-ended continuity); *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (holding fraudulent acts lasting seven years by single entity against single victim did not establish racketeering pattern).

The government argues Pinson's position on the SCSU Board establishes open-ended continuity "because bribery and kickback schemes tend to feed on themselves so as to become a pattern." Appellee's Br. 23 (internal quotation marks omitted). But this argument proves both too much and not enough. It proves too much because such a

15

bright-line rule would contravene our careful approach to RICO, which considers "the specific facts of each case." *H.J. Inc.*, 492 U.S. at 242. In other words, in the government's view, any person in an authoritative position involved in racketeering, no matter how slight, would inherently present a threat of continued crimes. We cannot accept this position in light of the "caution" we exercise in interpreting RICO. *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010). At the same time, the government's argument does not prove enough because even if we accepted this proposition, its reasoning would only reach the SCSU-related ventures; it would not apply to the VRE or Supremes ventures.

To be sure, in *United States v. Grubb*, we held that a state judge's predicate offenses involving illegal campaign contributions resulting in the election of his candidates of choice presented a continued threat of racketeering as long as the judge was in office. *See* 11 F.3d 426, 440 (4th Cir. 1993). There, we reasoned that all of the judge's predicate offenses, including bribery, mail fraud, and witness tampering, "demonstrate[d] a continued effort to use his judicial office to influence elections by illegally raised campaign contributions." *Id.* By contrast, here, Pinson's abuse of his Board seat only extended to two kickback schemes, one of which was entirely unfruitful while the other netted a mere $500. Therefore, this case does not present the same "distinct threat of long-term racketeering activity," *H.J. Inc.*, 492 U.S. at 242, we faced in *Grubb*. In light of the reasons above, we vacate Pinson's RICO conspiracy conviction on Count 1.

16

B.

Federal Program Theft

Pinson next challenges his convictions for government theft under 18 U.S.C. § 666. The government argues that Pinson violated the statute twice: first, when he participated in the diaper business venture, Supremes, LLC, which received grant money from Marion County (Count 2), and second, when he participated in the real estate development project, Village at River's Edge, which received grant money from the Columbia Housing Authority (Count 3). Because the evidence presented at trial, even when construed in the light most favorable to the government, fails to prove necessary elements of the crime in both cases, we also vacate these convictions.

Section 666(a) criminalizes, among other things, the conversion, embezzlement, or intentional misapplication of $5,000 or more by any "agent" of a covered governmental entity or private organization; it also criminalizes actions by any other person who corruptly influences that agent of a covered governmental entity or private organization. 18 U.S.C. § 666(a). To be covered under the statute, a governmental entity or private organization must receive within one year "benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." *Id.* § 666(b).

Thus, to convict someone under the statute in this case, the government needed to prove three elements: (1) that the defendant, or somebody the defendant aided and abetted, embezzled, converted, or otherwise fraudulently misapplied at least $5,000 in property under the care and control of an entity; (2) that this person was an "agent" of the

entity; and (3) that this entity received over $10,000 of federal "benefits" within one year. *Id.* Pinson's appeal on Count 2 concerns the second factor and the definition of "agent," while his appeal on Count 3 concerns the third factor and the definition of "benefits."

1.

Mims Was Not an "Agent" of a Covered Entity

Turning first to Count 2, Supremes, LLC signed an agreement with Marion County and the CCED, both state entities. This agreement provided money for Supremes, LLC to retrofit an aging commercial building and generate jobs in the county. Supremes, managed by Pinson and other associates, hired an acquaintance named Phillip Mims to serve as project manager for the retrofitting. Mims's job was to receive the invoices from the contractors hired by Supremes, package those invoices, and submit them to Marion County. Marion County then submitted these invoices to the CCED and requested payment.

At trial, the government sought to prove that: (1) Marion County was a covered governmental entity because it received over $10,000 in federal funds within one year; (2) Mims acted as an agent of Marion County; (3) Mims fraudulently converted at least $5,000 in funds from Marion County by submitting inflated invoices; and (4) Pinson and Mims aided and abetted each other. The evidence, however, failed to prove that Mims was an agent of Marion County.

Section 666(d) defines "agent" as "a person authorized to act on behalf of another person or a government" and includes "a servant or employee, and a partner, director, officer, manager, and representative." Our sister circuits have adopted slightly varying

18

definitions of the term based on this language. The broadest definition, adopted by the First, Third, and Eleventh Circuits, includes as an agent any person with authorization to act on behalf of the covered entity in some capacity, regardless of the person's official title. *See United States v. Keen*, 676 F.3d 981, 989–91 (11th Cir. 2012) (finding that a defendant was an "agent" for purposes of the statute because he had some authority to act on behalf of the county, even though defendant had little authority over the county's funds); *United States v. Vitillo*, 490 F.3d 314, 324 (3d Cir. 2007) (finding independent contractors to be "agents" of covered entity because they had been authorized to manage the project on the entity's behalf); *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 9 (1st Cir. 2001) (finding that although employee was "officially a consultant" to the covered entity, evidence showed that he effectively "acted as its executive director").

The evidence presented at trial, even when viewed in the government's favor, fails to meet this broad standard. Mims testified that a partner in Supremes, LLC hired him to be "project manager" for the building retrofit. In this capacity, Mims acted solely on behalf of Supremes by receiving and packaging invoices from the company's contractors and submitting them to Marion County for payment.

The government argues that Mims oversaw construction and managed invoices on the County's behalf, but this contention is belied by the evidence. Both Brown and Mims testified that Mims oversaw the construction for and reported to Supremes, LLC. In fact, a Marion County official testified that he did not really know who Mims was, and did not claim that Mims had any authority to act on the County's behalf. Finding a private

19

employee—who merely delivers invoices to a government entity—to be an "agent" of that entity would stretch the definition of the term beyond its breaking point.

The government resists this conclusion by relying heavily on *Vitillo*, arguing that a person is an "agent" of a government entity for purposes of § 666, even if that person is not actually employed by the government. While this can be true, it is not automatically the case; the person still must have some authority to act on behalf of the government entity. 18 U.S.C. § 666(d). In *Vitillo*, the entity in question (an airport authority) had hired an independent contractor to serve as its "primary engineer" for three years and delegated to him authority to manage various construction projects. 490 F.3d at 318–19, 322. Similarly, in *Sotomayor-Vazquez*, a consultant was an "agent" of an entity because he met with outside officials on the entity's behalf, and involved himself in the entity's personnel decisions. 249 F.3d at 9.

The evidence in this case proves no such close link between Mims and Marion County. In fact, it suggests the opposite. Mims had no actual or implied authority to act on Marion County's behalf in any capacity. Because Mims was not an agent of Marion County, his actions could not violate 18 U.S.C. § 666, meaning that Pinson cannot be criminally culpable under the same statute for aiding and abetting Mims. Therefore, we vacate Pinson's conviction under Count 2.

2.

VRE Did Not Receive a Federal "Benefit"

Regarding Count 3, the government focused on Pinson's direct embezzlement of funds paid to his real estate development company, VRE. VRE received these funds

20

from the Columbia Housing Authority. The Housing Authority, which had received a federal grant to help provide low-income subsidized housing, gave the funds to VRE for the construction of affordable housing units.

At trial, the government sought to prove that: (1) VRE was a covered government entity since it received over $10,000 in federal "benefits" within one year; (2) Pinson was an agent of VRE; and (3) Pinson misapplied at least $5,000 of VRE's funds. But because the money VRE received from the federal government is not a "benefit" for purposes of the statute, we find that the government failed to prove a key element of the crime.

While "benefit" is not explicitly defined in the statute, the Supreme Court has defined the term broadly, though not without limits. *See Fischer v. United States*, 529 U.S. 667, 677 (2000). In *Fischer*, the Court noted that while a government "benefit" could come in many forms, like a "loan" or "contract" or "grant," the term did not include certain payments made "in the usual course of business." *Id.* at 679. In coming to this conclusion, the Court referenced § 666's legislative history, indicating that "[n]ot every Federal contract or disbursement of funds [is] covered. . . . [I]f a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a Federal crime." *Id.* (quoting S. Rep. No. 98-225, at 370 (1984)).

Because any receipt of federal funds could "at some level of generality" be characterized as a benefit, and because the "statute does not employ this broad, almost limitless use of the term," the Court provided guidelines to distinguish between covered federal payments ("benefits") and non-covered payments. *Id.* at 681. The key question is

21

whether the funds are paid to the entity "for significant and substantial reasons in addition to compensation or reimbursement." *Id.* at 679. To make this determination, courts should examine the recipient entity's "structure, operation, and purpose" as well as "conditions under which the organization receives the federal payments." *Id.* at 681. Entities receive a "benefit" for purpose of § 666 when they are the subject of "substantial Government regulation" that helps them achieve "long-term objectives" or policy goals "beyond performance of an immediate transaction." *Id.* at 680. In contrast, if the payment is made "simply to reimburse," then the recipient entity isn't receiving a "benefit." *Id.* at 679.

Our sister circuits have applied this same analysis. *See United States v. Bahel*, 662 F.3d 610, 630 (2d Cir. 2011) (finding that a payment to the United Nations was a "benefit" since it was aimed to advance government's ongoing foreign policy objectives); *United States v. Dubón-Otero*, 292 F.3d 1, 8 (1st Cir. 2002) (finding that a grant to an institute to provide ongoing, high-quality health services was a "benefit"); *United States v. Copeland*, 143 F.3d 1439, 1442 (11th Cir. 1998) (finding that a defense contractor did not receive a "benefit" from federal government, because payment was purely a commercial transaction and not a form of federal assistance).

In this case, the government needed to prove that VRE, an entity of which Pinson was an agent, received a "benefit" of over $10,000 from the federal government. The Housing Authority certainly received a benefit when the federal government awarded it a grant to promote affordable housing. But the payment from the Housing Authority to VRE was for the construction of 60 housing units. An official from the Columbia

22

Housing Authority testified that the payments could not be used for "anything other than costs associated with the construction of the public housing units." J.A. 728. Thus, the federal funds VRE received furthered no goals "beyond performance of an immediate transaction." *Fischer*, 529 U.S. at 680. Instead, VRE more closely resembles the hypothetical equipment supplier in the statute's legislative history, cited by the Court in *Fischer*.

The government disagrees, relying primarily on *United States v. Hildenbrand*, 527 F.3d 466 (5th Cir. 2008). In that case, a nonprofit participated in a federal program where it purchased houses from a federal agency at a sizeable discount, rehabilitated them, and sold them to low-income individuals. *Id.* at 470–71, 477–78. The Fifth Circuit held that this nonprofit had received a "benefit" for purposes of § 666 because it participated in an ongoing federal program that provided tangible benefits to the nonprofit (discounted homes), within a broader regulatory scheme (promoting affordable housing). *Id.* at 477–78. Here in contrast, VRE didn't directly participate in the ongoing federal program and was merely supplying the products that the Columbia Housing Authority needed, without receiving any benefit other than what it would normally expect from a commercial transaction. The government's reliance on *United States v. Williams*, 527 F.3d 1235 (11th Cir. 2008), is similarly unpersuasive. The entity in that case applied for and received a federal grant for ongoing community engagement efforts. *Id.* at 1238–39. Crucially, the grant furthered broader policy goals and initiatives, and wasn't designed simply for reimbursement. *Id.*

23

Viewed in the light most favorable to the government, the evidence failed to show that the federal money given to VRE by CHA was for "significant and substantial reasons in addition to compensation or reimbursement." *Fischer*, 529 U.S. at 679. Thus, VRE is not a covered entity under § 666 because the federal money it received wasn't a "benefit," but instead payment for a commercial transaction.[3] Because Pinson was not an agent of a covered entity, we vacate his conviction under Count 3.

## C.

### Honest Services Fraud

We next turn to Pinson's convictions for honest services fraud, specifically dealing with his involvement in the homecoming concert (Count 12) and the attempted purchase of Sportsman's Retreat (Count 18). Viewing the evidence regarding these convictions in the light most favorable to the government, we affirm.

"[T]o convict a person of mail fraud or wire fraud, the government must show that the defendant (1) devised or intended to devise a scheme to defraud and (2) used the mail or wire communications in furtherance of the scheme." *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012). One such "scheme to defraud" is defined in § 1346: the

---

[3] The government makes other arguments about the language in § 666(c), but these don't directly bear on the definition of "benefit." Section 666(c) exempts from the statute bona fide payments for salary, wages, and compensation made in the usual course of business. The cases that the government cites focus on whether a § 666 prosecution can be brought against employees who either inflate or misappropriate their salaries, and not on whether the entities in question received a "benefit" from the federal government for purposes of the statute. *See Grubb*, 11 F.3d at 434. While these decisions properly found that fraudulent wage payments were not per se excluded from § 666 by subsection (c), they have little relevance here.

24

deprivation of another's intangible right to the defendant's honest services. As interpreted by the Supreme Court, § 1346 covers bribery and kickback schemes. *Skilling v. United States*, 561 U.S. 358, 368 (2010). It generally doesn't include "undisclosed self-dealing," or when the defendant takes an action that "furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 409 (internal quotation marks omitted).

Regarding Count 12, Givens's testimony established that both he and Pinson wanted the University to choose W.E. Entertainment as its 2011 concert promoter. Givens also testified that he and Pinson expected to receive a portion of the company's pre-concert $12,500 payment. This pre-concert kickback was in addition to the disclosed post-concert profit-splitting plan that Pinson had with Joy and Robinson. The government also established that Givens received part of his expected kickback from Robinson, and that Pinson later received a similar portion from Robinson electronically. On this evidence, a rational jury could view Pinson's expected receipt of the kickback, coupled with his actions on W.E. Entertainment's behalf, as a scheme to defraud and deprive the University and the citizens of South Carolina of his honest services as Chairman of the Board of Trustees of SCSU.

Pinson also aided Givens's decision to sign the actual concert promotion contract on behalf of the University with W.E. Entertainment. Givens's signing of the contract qualifies as an "official act," even under the more restrictive definition that the Supreme Court recently adopted when interpreting the term in a separate bribery statute. *See McDonnell v. United States*, 136 S. Ct. 2355, 2371–72 (2016) (holding that an "official

25

act" needed to be something more than "[s]etting up a meeting, hosting an event, or calling an official," and instead was a decision or action on a "question, matter, cause, suit, proceeding or controversy" which involves "a formal exercise of governmental power"). A rational jury could find, based on the evidence presented, that Pinson encouraged Givens to take this official act in anticipation of the pre-concert kickback that both officials expected to receive from Joy and Robinson.

Regarding Count 18, Zahn testified about his discussions with Pinson concerning the University's potential purchase of Sportsman's Retreat, a property that Zahn owned. According to Zahn, Pinson genuinely expected to receive a Porsche in exchange for his efforts to persuade the University to purchase the retreat. This qualifies as a kickback under the statute, depriving the University and the citizens of South Carolina of Pinson's honest services as Chairman of the Board of Trustees of SCSU. *See Skilling*, 561 U.S. at 410 (describing how § 1346 covers "classic kickback scheme[s]" where an "official conspire[s] with a third party so that both [can] profit from wealth generated by public contracts"). The evidence also showed that Pinson worked hard to persuade various University officials to approve the purchase, and that he encouraged Givens to send Zahn an official letter of intent expressing the University's desire to purchase the property. Thus, there was sufficient evidence to support Pinson's conviction under Count 18.

D.

Mail and Wire Fraud

Pinson next contests his convictions under Counts 25 and 26 for defrauding Marion County using the mail and wire system. He claims that both Counts incorporate a

factual allegation from Count 2: that the grant funds fraudulently procured by Pinson were "under the care and control of Marion County." J.A. 88. Pinson claims that the government failed to prove this fact at trial. We disagree.

It is true that Marion County did not have the grant funds before distributing them to vendors. Instead, the County issued payments to vendors from its own treasury and then sought reimbursement from the CCED's pool of grant funds. But the terms "care" and "control" mean more than mere physical possession.[4] And while Marion County may not have had the grant funds in hand, it was nonetheless responsible for the proper safekeeping and use of the funds, pursuant to its agreement with the CCED. The evidence showed that Marion County had the power to influence the payment of the grant funds by submitting invoices to the CCED. A jury could reasonably find that Pinson fraudulently obtained funds which were "under the care and control" of Marion County. We therefore affirm his convictions for mail and wire fraud under Counts 25 and 26.

Pinson challenges his convictions for mail and wire fraud under Counts 27 to 34 on separate grounds. These Counts stemmed from Pinson's skimming of payments made by the Columbia Housing Authority to VRE, payments which VRE was supposed to send to SK Builders for its work on the development. Pinson argues the evidence didn't show his intent to "defraud" the Housing Authority, but merely an intent to "deceive." We find the distinction unpersuasive.

---

[4] *See Random House Webster's Unabridged Dictionary* 314, 442 (2d ed. 2001) (defining "care" as "protection; charge" and defining "control" as "to exercise restraint or direction over," among other definitions).

27

As this circuit has noted, the term "defraud" in 18 U.S.C. §§ 1341, 1343 requires the government to prove a specific intent to deprive someone of something of value; mere dishonesty toward the victim isn't enough. *Wynn*, 684 F.3d at 477–78. Pinson claims that the Housing Authority got exactly what it asked VRE for: 60 housing units at the agreed cost. Because VRE's skimming of the payments harmed its contractors, including SK Builders, and didn't harm the Housing Authority, Pinson claims that he didn't deprive the Authority of anything.

But Pinson misreads the Indictment. Counts 27 to 34 not only charge Pinson with defrauding the Housing Authority, but also allege that he "withheld or delayed payments for legitimate services to the general contractor and sub-contractors" by illegally keeping part of the Housing Authority's payments for his own personal use. J.A. 104. Pinson's associates testified to his fraudulent behavior regarding the payments, and an SK Builders official testified that the company is still owed about $190,000 for its work. That evidence was enough for a jury to conclude that Pinson used mail and wire communications to defraud VRE's contractors, by skimming payments owed to them. Thus, we affirm Pinson's convictions under Counts 27 to 34.

E.

Money Laundering

We turn next to Pinson's convictions for money laundering (Counts 35–41). Sections 1956 and 1957 (the anti-money-laundering statutes) prohibit certain transactions in property derived from "specified unlawful activity." Pinson's only challenge to his

28

money laundering convictions is that his convictions for the underlying "unlawful activity" should be vacated.

Where a money laundering charge depends on multiple counts of "specified unlawful activity," the money laundering conviction generally should be upheld if it is predicated on any underlying counts that are also upheld. *See Griffin v. United States*, 502 U.S. 46, 60 (1991) ("[I]f the evidence is insufficient to support an alternative legal theory of liability," the court's refusal to remove that theory from the jury's consideration "does not provide an independent basis for reversing an otherwise valid conviction."); *United States v. Ward*, 197 F.3d 1076, 1082 (11th Cir. 1999).

All of Pinson's money laundering convictions stem from unlawful activity in violation of § 666 (government program theft) and §§ 1341–43 (mail and wire fraud). Although we are vacating Pinson's § 666 convictions, we affirm his convictions under §§ 1341–43. That in turn requires that we affirm Pinson's convictions for money laundering.

F.

False Statements

Pinson next challenges his convictions under 18 U.S.C. § 1001, which criminalizes making a false statement "in any matter within the jurisdiction" of the three branches of federal government. The government's evidence showed that Pinson knowingly submitted false federal pay applications (developed by the Department of Housing and Urban Development, or "HUD") to the Columbia Housing Authority to receive federal grant money. Pinson argues that because the government didn't prove the

29

Housing Authority acted as an agent of HUD, as the Indictment claimed, Pinson's false statements were made on a matter outside the jurisdiction of the three federal branches.

Pinson's argument, however, is foreclosed by our decision in *United States v. Jackson*, 608 F.3d 193 (4th Cir. 2010). There, we applied the Supreme Court's guidance that the term "jurisdiction" in § 1001 should not be given a "narrow or technical meaning," but rather referred broadly to the government's power to "exercise authority." *Id.* at 196 (quoting *United States v. Rodgers*, 466 U.S. 475, 479 (1984)). We found an employee violated § 1001 when he submitted false timesheets to his employer, a private contractor working with a government agency on a project funded by federal money. *Id.* at 194–95. In reaching that conclusion, we held that the government had the authority to not pay a false invoice, regardless of whether the defendant first submitted that invoice to a third party or to the government itself. *Id.* at 197. This "authority to safeguard federal funds" was an "official, authorized function of the executive branch" and was "a sufficient jurisdictional nexus on its own" for purposes of § 1001. *Id.* at 198.

Here, the Columbia Housing Authority had the authority and responsibility to properly disburse federal funds from HUD. In that sense, the Housing Authority acted on behalf of HUD for purposes of spending this federal grant. Furthermore, the evidence showed that HUD could revoke the grant money if the project didn't meet certain specifications, including timeframe and materials requirements.

As we explained in *Jackson*, the executive branch has the authority to protect itself against fraud targeting federal funds. Indeed, this was why HUD required Pinson and the Housing Authority to record building expenses and submit requests for payment on

30

federal forms.  A rational jury could conclude that Pinson lied on these forms, given the trial testimony of Mims and Housing Authority officials that Pinson was improperly managing payments.  Therefore, we affirm Pinson's convictions under Counts 43–46 and 48–50.

## III.

### Constructive Amendment of the Indictment

Finally, Pinson argues that the district court's jury instructions on Counts 12 and 18 (Honest Services Fraud) constructively amended the grand jury's indictment against him, violating his Fifth Amendment rights.  We review de novo claims that an indictment was constructively amended during trial.  *United States v. Allmendinger*, 706 F.3d 330, 339 (4th Cir. 2013).

A constructive amendment occurs when the court alters the elements of the charged offense listed in the indictment, so that the defendant is actually convicted of a crime other than the one charged.  *United States v. Malloy*, 568 F.3d 166, 177–78 (4th Cir. 2009).  If at any time the court broadens the bases for conviction beyond those charged in the indictment, it is per se reversible error, since this violates the Fifth Amendment's grand jury guarantee.  *Id.* at 178.  Importantly, the government is bound by the phrasing it uses in the indictment, even if it chooses to use more specific language than necessary.  *See United States v. Randall*, 171 F.3d 195, 208–09 (4th Cir. 1999) (holding that although the government did not need to specify a particular predicate

31

offense to obtain a conviction under a statute, once it did so in the indictment, it needed to prove that predicate offense to secure a valid conviction).

Pinson contends that Counts 12 and 18, which incorporate Count 1, specify that he had a fiduciary duty as a public official under South Carolina law. Because the district court chose to instruct the jury using a different definition of "public official," taken from Black's Law Dictionary, Pinson argues that the Indictment was constructively amended.

Ultimately however, we don't need to analyze whether the Black's Law definition of "public official" is broader than South Carolina's definition, because Pinson misinterprets the Indictment.[5] By its own terms, the Indictment's language doesn't restrict itself to South Carolina's definition when discussing "public official." Count 1, which is incorporated into Counts 12 and 18, states: "As an elected member of the Board of a state-supported university, Pinson was a public official, and was required to report certain benefits that he received as a public official to the South Carolina Ethics Commission." J.A. 53. The indictment later states: "Pinson failed to report certain benefits that he demanded and received as a leader of the enterprise (two of which are described in Overt Acts 18 and 94 below) to the South Carolina Ethics Commission as required by state law." J.A. 67.

---

[5] Pinson's misreading of the Indictment is due in part to the government's representation earlier in the trial that state law would govern the definition of "public official." The district court ultimately decided that a uniform definition of "public official" would be most appropriate. The government's mistaken initial understanding of the term, however, does not change the language of the indictment.

The indictment never specifies that Pinson was a public official as defined by South Carolina law. Instead, it charges Pinson with violating his fiduciary duties as a public official, including responsibilities that he had under South Carolina law to the State Ethics Commission. Mere description of Pinson's state-related duties does not automatically apply state legal definitions to every term in the same paragraph of the indictment. Because the district court did not broaden the bases for Pinson's conviction, we reject Pinson's argument that the indictment was constructively amended.

IV.

For the reasons given, we vacate Pinson's convictions for government program theft and RICO conspiracy, but otherwise affirm the jury's verdicts. We remand for resentencing.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED FOR RESENTENCING*

DIAZ, Circuit Judge, dissenting as to Parts II.A. and IV.

The majority finds that the evidence was insufficient to prove the existence of a single conspiracy involving a RICO enterprise, or to prove a pattern of racketeering activity. Given the deferential posture under which we review jury verdicts, I respectfully disagree.

To obtain a conviction for RICO conspiracy under § 1962(d), the government must first prove that a RICO "enterprise" exists. Second, it must show that the defendant conspired to participate in the enterprise's affairs and that the defendant agreed that he or someone else in the enterprise would commit at least two racketeering (or "predicate") acts.[1] *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). Finally, the government must prove a "pattern" of racketeering activity by linking the two predicate acts to continuous criminal activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238–39 (1989). The majority finds the government failed to prove the first and third elements. I address those elements in turn.

A RICO enterprise exists when a group of persons "associate[] together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). To prove an enterprise's existence, the government must demonstrate "that the various associates function as a continuing unit" and must offer

[1] Section 1961(1) defines the types of predicate activity that are subject to sanction under RICO, and includes (among other crimes) money laundering, mail fraud, and wire fraud. The jury convicted Pinson of mail and wire fraud, money laundering, and honest services fraud; since we uphold those convictions, the government has met its burden on this second element.

"evidence of an ongoing organization." *Id.* This organization however can either be a "formal" legal entity or, as is the case here, an "informal" group. *Id.* In *Boyle v. United States*, the Supreme Court held that an informal or "association-in-fact" RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. 938, 946 (2009). A jury could have reasonably inferred these three structural features based on the government's case against Pinson.

At trial, the government's evidence showed that the purpose of Pinson's enterprise was to enrich its members through kickbacks and embezzlement of grant money. Mims, Givens, Zahn, and Williams testified that the group used numerous business ventures to commit financial fraud, including Supremes (the diaper business), VRE (the real estate project), SCSU's homecoming concert, and SCSU's acquisition of an off-campus retreat. Many of Pinson's associates participated in more than one venture; the real estate and diaper schemes, for example, involved almost the exact same individuals. There were also connections between the grant-related frauds and the SCSU-related kickbacks. Williams testified that Brixstone, which took an active role in the diaper business venture, also was "supposed to be used for moving money" discretely from schemes involving SCSU, where Pinson and Wright served on the Board of Trustees. J.A. 923. And Givens testified that he and others planned to use their connections at the University to generate business opportunities for Mims—who was involved in the diaper business and real estate project—with the expectation "[t]hat there would be some type of sharing

35

of the profit." J.A. 368–69. Given this evidence, a reasonable jury could have found that the government met its burden on the "purpose" element.

As the majority notes, the purpose of this particular RICO enterprise overlaps with that of the enterprise's underlying acts: to enrich Pinson and his associates. But the Supreme Court has reminded us that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." *Boyle*, 556 U.S. at 947 (internal quotation marks omitted). The enterprise in *Boyle*, for example, comprised of a changing group of robbers who sought to enrich themselves by committing repeated bank burglaries and robberies. *Id.* at 941. The Court recognized that "the existence of an association-in-fact [enterprise] is oftentimes more readily proven by what [it] does, rather than by abstract analysis of its structure." *Id.* at 951 (quoting jury instructions used by the district court). That principle applies especially well to this case.

*Boyle* also requires evidence showing relationships between members of the enterprise. The majority argues that there was little overlap, in that Pinson was the only person involved in all four ventures. *Boyle* cautions us, however, that an enterprise need not necessarily have "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." *See id.* at 945–47. Accordingly, the government need not show that the enterprise had any formal hierarchy, name, rules, or absolute continuity in membership; indeed "different members may perform different roles at different times." *Id.* at 948. Furthermore, "nothing in RICO exempts an

36

enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id.*

In this case, the government presented substantial evidence of interrelatedness between the enterprise's various members. Mims, Robinson, Wright, Williams, and Givens were each involved in two of the four schemes. Additionally, some of these individuals helped facilitate other members' participation in Pinson's various ventures. Robinson, for example, introduced Pinson, Wright, and Williams to Brown, the prior owner of the diaper business, and Givens introduced Pinson and Wright to each other. These introductions may have been innocuous, but the resulting schemes were anything but. Many of these individuals planned to—and in some cases, did—take advantage of their roles at SCSU or in grant-supported ventures to generate fraudulent payments for associates involved in other schemes. While I agree that the evidence is not overwhelming, a rational jury could have found a sufficient relationship among members of the enterprise.

Other than proving the existence of a RICO enterprise, the government also needed to prove a pattern of racketeering activity. To establish such a pattern, the government had to show "continuity plus relationship." *H.J. Inc.*, 492 U.S. at 239 (emphasis omitted) (quoting S. Rep. No. 91–617, at 158 (1969)). "Relationship" refers to whether the two predicate acts are sufficiently related to each other or the enterprise itself. *Id.* at 240. The government can prove "relationship" in a variety of ways, including focusing on whether the acts have "similar purposes, results, participants, victims, or methods of commission." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 182 (4th

37

Cir. 2002) (quoting *H.J. Inc.*, 492 U.S. at 240). Under that broad standard, and viewing the evidence in the light most favorable to the government, the predicate acts in this case were related enough to each other because of their common purpose and similar participants and methods. All acts aimed to enrich Pinson and his associates, most of whom knew each other and participated in at least two schemes. All of the acts also involved misuse of public funds, by either exploiting public positions for kickbacks or fraudulently managing grant payments.

"Continuity," on the other hand, refers to whether the predicate acts constitute a threat of continuing racketeering activity. *H.J. Inc.*, 492 U.S. at 240–41. The government can prove a threat of continuing activity either by demonstrating "repeated" racketeering conduct over a "substantial" period of time ("closed-end" continuity), or by showing "past conduct that by its nature projects into the future with a threat of repetition" ("open-ended" continuity). *Id.* at 241–42.

Here, the government presented evidence of past conduct which a jury could find demonstrated a threat of repetition. At trial, Givens testified that both he and Pinson expected to continue using their University positions to benefit themselves and their business partners by influencing the University's energy contracting and purchasing decisions. In particular, Givens testified to planning ways to steer University business to Mims and other associates of Pinson. Mims also testified about the group's involvement in both grant-related frauds, as well as his attempt to get on the board of the Columbia Housing Authority so that Pinson and his partners could "have control or their people in place on the Board" for other projects. J.A. 1161.

38

We have found that certain kickback schemes, which rely on an official improperly using the powers of his position, may perpetuate themselves if the culpable official remains in that position. *See United States v. Grubb*, 11 F.3d 426, 440 (4th Cir. 1993) (finding that a public official was likely to continue improperly influencing elections as long as he remained in office, based on his past conduct). And courts have also found in certain circumstances that grant-related fraud can present a sufficient threat of repetition. *See United States v. Hively*, 437 F.3d 752, 762 (8th Cir. 2006) (finding open-ended continuity in part because defendant was still improperly receiving grant money "[a]t the time the search warrant was executed").

While we today correctly reject the notion that "any person in an authoritative position involved in racketeering, no matter how slight, would inherently present a threat of continued crimes" Op. at 16, a jury didn't need to accept that argument to convict Pinson of RICO conspiracy. Instead, it could rely on evidence of the group's past conduct, its plans to continue perpetuating fraud,[2] and evidence about positions of power that Pinson and others held, in order to find a threat of continuing criminal activity. That evidence (when viewed in the light most favorable to the government) established that fraudulent activity involving public funds was a "regular way of doing business" for Pinson and his associates. *H.J. Inc.*, 492 U.S. at 242.

---

[2] Pinson and Mims continued to submit false pay applications to the Columbia Housing Authority for a few months after investigators began wiretapping Pinson's calls.

\* \* \*

The prosecution's failure to prove government program theft was "clear." *United States v. Chittenden,* 848 F.3d 188, 195 (4th Cir. 2017). There was no such "clear" failure for RICO conspiracy. A jury could reasonably find that the government proved a RICO enterprise existed, and that it posed a threat of continuing racketeering activity. Accordingly, I would affirm Pinson's conviction for RICO conspiracy.