**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4405**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GEORGE ALEXANDER UNDERWOOD, a/k/a Big A,

Defendant - Appellant.

---

**No. 22-4428**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOHNNY RICARDO NEAL, JR.,

Defendant - Appellant.

---

**No. 22-4429**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ROBERT ANDREW SPROUSE,

        Defendant - Appellant.

_____

Appeals from the United States District Court for the District of South Carolina, at Rock Hill.  J. Michelle Childs, District Judge.  (0:19-cr-00420-JMC-1; 0:19-cr-00420-JMC-2; 0:19-cr-00420-JMC-3)

_____

Argued:  December 6, 2023                               Decided:  March 18, 2024

_____

Before WILKINSON, NIEMEYER, and AGEE, Circuit Judges.

_____

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

_____

**ARGUED:**  Clarence Rauch Wise, Greenwood, South Carolina, for Appellants.  Sonja M. Ralston, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Elizabeth Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellant George Alexander Underwood.  Emily Deck Harrill, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina, for Appellant Robert Andrew Sprouse.  Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Corey R. Amundson, Chief, Public Integrity Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

2

NIEMEYER, Circuit Judge:

This appeal challenges various aspects of a trial during which an elected county sheriff and two of his deputies were convicted and sentenced for abuses of power by which they enriched themselves and bullied others.

George Underwood was elected in 2012 to serve as the Sheriff of Chester County, South Carolina, which is a small rural county with a population of roughly 32,000 people in the northern part of the State.  Exercising his broad power as Sheriff of a small county, he enriched himself by directing his deputies to do work, while on the public payroll, to improve his personal property, including converting and expanding a modest barn into a home entertainment center.  He also enriched himself and others by devising a system with Lieutenant Johnny Neal to skim money from the extra compensation payable to his deputies for their work manning drunk-driver automobile checkpoints in the County.  In a similar vein, Sheriff Underwood and Chief Deputy Robert Sprouse used County money to pay for first-class travel and the travel expenses of their wives when attending a conference in Reno, Nevada, contrary to existing County procurement rules.  Finally, he made purchases for his office that did not follow the established County procurement procedures.

Sheriff Underwood also abused his authority in the County by targeting enforcement and harassment against opponents and refusing to investigate offenses reported against friends and supporters.  And on one occasion in particular, he arrested a citizen without probable cause who was recording on his cellphone a serious accident from which a driver had fled.  Provoked by the citizen's recording, repeated flippant comments, and slow compliance with Sheriff Underwood's direction that he retreat to his porch, Sheriff

3

Underwood placed the citizen under arrest without probable cause, alleging that the citizen had engaged in disorderly conduct and detaining him in jail for three nights.

After the FBI uncovered the corruption, as well as the violation of the citizen's civil rights, Chief Deputy Sprouse and Lt. Neal conspired to lie and fabricate documents to cover up the Sheriff's Office's misconduct.

The government charged Sheriff Underwood, Chief Deputy Sprouse, and Lt. Neal with various violations of federal law in a 17-count indictment, and, after a two-week trial, the jury convicted them variously on 13 counts.

From the district court's judgment, the defendants filed these appeals, arguing that, on some counts, the statutory elements were not proved; that the evidence was insufficient to support some convictions; and that the district court erred in admitting certain evidence at trial. They also argue that the district court erred in sentencing and in calculating the losses for restitution.

After considering each of the defendants' arguments and carefully reviewing the record, we affirm.

I

By early 2018, an ongoing FBI investigation into public corruption began to uncover evidence of official corruption in the Chester County Sheriff's Office. The evidence showed that deputy sheriffs in the Office were regularly directed to perform work while on County time to improve Sheriff Underwood's personal property, including a barn and a pond, as well as the properties of other Sheriff's Office leaders. Most significantly, the

4

deputies, as employees of the Sheriff's Office, were directed to expand and convert Sheriff's Underwood's modest barn into a large entertainment center, with a bar, a bar sitting area, and a dance floor. The refurbished barn, referred to as his "man cave," also had a television, a large beer-storage refrigerator, decorative lighting, and ceiling fans. The officers were instructed to report during regular work hours to the barn, in old clothes, and to record their time on timesheets as if they were working on the business of the County. And the County compensated them accordingly.

Evidence also showed that Sheriff Underwood and Lt. Neal skimmed money from the extra compensation payable to deputies for their work in manning drunk-driving checkpoints in the County. The checkpoints were established and funded by a private entity — the Hazel Pittman Center — with a grant from the federal government. Under arrangements made by Sheriff Underwood and Lt. Neal, the Hazel Pittman Center agreed to pay sheriff's deputies $25 to $30 per hour for manning the checkpoints, which was compensation paid in addition to the deputies' compensation as employees in the Sheriff's Office. Following the receipt of invoices from the Sheriff's Office, the Hazel Pittman Center sent checks for the deputies to the Sheriff's Office, with the explanation that they were to pay for each deputy's work, as agreed. Under Sheriff Underwood's direction, the payments were not deposited in the Sheriff's Office's normal bank account but were deposited in the Chester County Detention Center's bank account, which was designated to hold money taken from inmates after their arrest until they were released. Lt. Neal's wife did the bookkeeping at the Detention Center, and she created dummy inmate identification numbers for the Hazel Pittman Center checks paid to deputies, labeling them

5

as "donations." Checks were then cut and paid directly to deputies without going through the County payroll office, where taxes would have been withheld. The evidence showed that for 11 checkpoints in 2016 and 2017, the deputies who manned the checkpoints did not receive the full amount listed on the invoices sent to the Hazel Pittman Center. Indeed, with respect to some checkpoints, the deputies who did the work received no money. Instead, the deficiencies were paid to Sheriff Underwood, Lt. Neal, and another deputy, Major Randy Marsh.

Other evidence of public corruption involved Sheriff Underwood and Chief Deputy Sprouse's travel to a professional conference in Reno, Nevada, in June 2017. Underwood submitted a travel request to the County to cover payment for his and Sprouse's wives and to cover first-class travel for all. The request, however, "got kicked back" by the County purchasing department, as the County would not, under established rules, pay for first-class travel and would not pay spouses' travel expenses. Sheriff Underwood and Chief Deputy Sprouse then revised their request to cover travel for Sheriff Underwood, Chief Deputy Sprouse, Lt. Neal, and Deputy Al Crawford, even though Neal and Crawford never planned to go to the conference and, in fact, did not go; the wives went as originally planned. The first-class tickets cost the County over $5,600. When, some two years later, the press questioned Sheriff Underwood why he and Chief Deputy Sprouse had taken their wives to the conference and flew first class, only then — two years after the trip — did they write checks to reimburse the County for their wives' tickets. They also made up a story to the reporter to justify their first-class tickets, stating falsely that Sheriff Underwood had "knee

6

problems" and that their wives went only when "Neal [and] Crawford . . . were unable to attend."

Unrelated to the evidence of financial corruption, the FBI also opened a separate investigation in late 2018 into civil rights violations committed by Sheriff Underwood and Lt. Neal, when it received information that the Sheriff's Office may have arrested an innocent citizen without probable cause.

The evidence revealed that on November 20, 2018, after a serious automobile accident occurred and one driver had fled the scene, a private citizen, Kevin Simpson, exited his mother's trailer home where he was living at the time and, from his front yard, began recording the scene with his cellphone. He broadcast the recording on Facebook Live, accompanied by his own narration, and the recording continued for over 25 minutes. Early during the recording period, Sheriff Underwood approached Simpson and said, as was recorded on Simpson's cellphone, "They got somebody on the loose out here. How about standing on the porch? I don't want nothing to happen to you." Simpson responded, "Okay, on the loose, alright, I'm straight." Underwood then added, "Yeah, yeah, I don't want nothing to happen to you and your son there." And Simpson answered, "Alright." Simpson, however, continued recording the events, standing the entire time in his front yard. Toward the end of the recording, Sheriff Underwood approached Simpson, and they again engaged in dialogue, as follows:

Underwood: "Didn't I tell you to get on the porch?"

Simpson: "Aint we straight in our yard?"

Underwood: "Answer my question. Didn't I tell you to get on the porch?"

7

> Simpson: "Yeah, yeah you did . . . aint we straight in our yard?"
>
> Underwood: "Then get on the porch!  Let me, let me say something to you."
>
> Simpson: "Aint we straight in our yard?"
>
> Underwood: "Let me say something to you.  I'm doing a manhunt out here.  I got somebody armed and dangerous out here.  Get on your porch!"
>
> Simpson: "I aint worried about it man."

Underwood continued to order Simpson to the porch, and Simpson started retreating to the porch.  Simpson then said, "Let's stand on the steps," to which Underwood said, "Get on the porch!"  The exchanges that followed became repetitive, as Simpson said several times, "Now manhunt" and Underwood said several times, "Move on to the porch."  After Simpson was on the porch, Underwood instructed him, "Stay on the porch!"  Simpson responded, "Now manhunt!  Do your job!  I'm on the porch."  After one more similar exchange, Underwood said, "I'll tell you what.  Step over here.  Bring your phone.  You're going to get hurt.  You're under arrest, put your hands behind your back."  Sheriff Underwood then grabbed Simpson and the two tussled, falling from the porch into the yard while Underwood tried to place Simpson in handcuffs.  Lt. Neal, who was standing nearby, then assisted Sheriff Underwood and placed handcuffs on Simpson.  Simpson was taken to jail where he spent three nights, including Thanksgiving Day, before being released.

While engaged in the tussle with Simpson in his effort to arrest him, Sheriff Underwood apparently dropped or misplaced his police radio.  Chief Deputy Sprouse then directed Major Burley McDaniel, the head of investigations in the Sheriff's Office, to obtain a warrant to search the trailer home of Simpson's mother to recover not only Sheriff

8

Underwood's police radio, but also Simpson's cellphone. Before the warrant was issued, however, Simpson's mother, Ernestine Simpson, allowed officers to enter the trailer where the officers "started going through" her cellphone that was on the counter in order to call and find Simpson's cellphone. The officers found Sheriff Underwood's police radio in the grass near the trailer home, and Chief Deputy Sprouse took Ernestine's cellphone with him, handing it to a deputy to take it back to the Sheriff's Office, but he did not log the cellphone in as evidence. The FBI later recovered the cellphone from the Sheriff's Office during its investigation.

It was over a month after Simpson streamed his video on Facebook Live that the FBI began its investigation, having received a complaint about Simpson's arrest from South Carolina's State Law Enforcement Division. On January 2, 2019, FBI Special Agent Julie Yelk emailed the Chester County Sheriff's Office, requesting the incident report for Simpson's arrest. The records custodian at the Sheriff's Office told Special Agent Yelk that they did not have any such record. Yelk then decided to go to Chester County to investigate what had happened on the day that Simpson was arrested. The next morning, she called the Sheriff's Office and set up interviews with Chief Deputy Sprouse and Lt. Neal starting at 3:30 that afternoon, January 3. Within an hour of Special Agent Yelk's call, Deputy Sprouse and Lt. Neal started preparing an incident report, which they edited over the next several hours.

During his interview, Lt. Neal gave Special Agent Yelk the report and acknowledged that he and Chief Deputy Sprouse had just prepared the report that day, over a month after Simpson's arrest. As Chief Deputy Sprouse later told Special Agent Yelk,

9

"[I]ncident reports are typically completed at the end of [the officer's] shift," and "[i]f it's late in the evening, they may be completed the next morning." And Lt. Neal confirmed that "incident reports are typically done within 24 hours of the incident."

The report that Chief Deputy Sprouse and Lt. Neal created and presented to Special Agent Yelk recounted that "Simpson was walking back and fo[rth] from his yard into the roadway" and that Simpson "was told several times by deputies to stay out of the roadway and go into his yard." It recounted that "Simpson was back in the roadway" when "Neal was escorting the EMS workers to the helicopter with the patient." The report concluded that after Sheriff Underwood "told [Simpson] to get back in his yard," Simpson "began using profane language and [became] loud and boisterous," saying "in his own words" "go look for the fu@#ing person y'all looking for then." The report indicated that Simpson was arrested for "disorderly conduct." It said nothing about the officers' entry into Ernestine Simpson's trailer, nor did it refer to the fact that Chief Deputy Sprouse had taken Ernestine's cellphone.

During her interview with Chief Deputy Sprouse, Special Agent Yelk asked about Ernestine's cellphone, but Sprouse denied having taken it, saying, "[T]here was no phone taken from the residence that he was aware of" and "the phone would not have been evidence, therefore there would have been no need to take the phone." He added that "[h]e would have known if the phone was taken." A week later, Special Agent Yelk again interviewed Chief Deputy Sprouse, and she again questioned Sprouse about Ernestine's cellphone. Sprouse stated again that "the phone had not been taken and that there was no reason to take Mrs. Simpson's phone as evidence."

10

Despite Chief Deputy Sprouse's statements about the cellphone, the FBI shortly thereafter recovered it from Major McDaniel's desk in the Sheriff's Office.

Acting on the information collected by the FBI in its two investigations, the grand jury indicted Sheriff Underwood, Chief Deputy Sprouse, and Lt. Neal variously in 17 counts, addressing both the financial crimes uncovered and the violation of Simpson's civil rights. Following a 9-day trial, the jury returned guilty verdicts on 13 counts. All three defendants were convicted on Count 1 for conspiracy, and the jury attributed different objects of the conspiracy to the three for violations of 18 U.S.C. §§ 1343, 1519, and 666(a)(1)(A). On Count 2, Sheriff Underwood and Lt. Neal were convicted for arresting Kevin Simpson and detaining him without probable cause, thus depriving him of his civil rights, in violation of 18 U.S.C. § 242. On Count 5, Chief Deputy Sprouse and Lt. Neal were convicted of impeding, obstructing, and influencing a federal investigation with their false incident report, in violation of 18 U.S.C. § 1519. On Count 8, Chief Deputy Sprouse was convicted for making false statements to the FBI about the removal of Ernestine's cellphone from her home, in violation of 18 U.S.C. § 1001. On Count 9, all three defendants were convicted for stealing money by misapplying deputies' services that were in the care and control of the County, in violation of 18 U.S.C. § 666(a)(1)(A). And on Counts 10–17, Sheriff Underwood and Lt. Neal were variously convicted for stealing money from deputies who had manned the checkpoints in Chester County, in violation of 18 U.S.C. § 1343. Both were convicted on Counts 11–14, and Lt. Neal alone was convicted on the remaining four, Counts 10, 15–17. As to the remaining four counts in the indictment, the jury acquitted the defendants named in them.

11

Following separate sentencing hearings for each defendant, the district court sentenced Sheriff Underwood to 46 months' imprisonment, three years' supervised release, and ordered him to pay $29,969.30 in restitution; Chief Deputy Sprouse to 24 months' imprisonment, three years' supervised release, and ordered him to pay $24,749.30 in restitution; and Lt. Neal to 46 months' imprisonment, three years' supervised release, and ordered him to pay $29,969.30 in restitution. The court also ordered that all three defendants be jointly and severally liable for paying the restitution.

From the district court's judgments dated July 12, 2022, the defendants filed these appeals, which we consolidated.

## II

All three defendants contend first that the evidence failed to satisfy two elements of the crime of conviction under Count 9, charging them with federal-program theft, in violation of 18 U.S.C. § 666(a)(1)(A). Section 666 punishes any *agent* of a state or local governmental entity who steals $5,000 or more from that entity if it *has received more than $10,000 in federal benefits* in any one year. The defendants maintain that they did not violate § 666 because (1) they were not "agents" of Chester County, as charged, and (2) Chester County had not received more than $10,000 in federal benefits in the preceding year.

In maintaining that they were not "agents" of Chester County, the defendants argue that they were, as a matter of law, employees of the State of South Carolina, not Chester County. They note that the office of the sheriff was created by Article V, Section 24 of the

12

South Carolina Constitution, and argue accordingly that sheriffs' offices are totally independent of county government. Therefore, they assert, sheriff's deputies are answerable only to the sheriff and not to any county government, citing *Allen v. Fidelity & Deposit Co. of Maryland*, 515 F. Supp. 1185, 1190 (D.S.C. 1981). Moreover, they cite South Carolina court decisions that have held that sheriffs are employees of the State for various purposes. *See Heath v. County of Aiken*, 368 S.E.2d 904, 905 (S.C. 1988) (agreeing that sheriffs' deputies were not "county 'employees' for purposes of Section 4-9-30(7)'s personnel policies and grievance procedure"); *Botchie v. O'Dowd*, 384 S.E.2d 727, 729 (S.C. 1989) (stating that "the legislature did not intend for deputies to be included within the term 'employees'" of a county for certain purposes); *Edwards v. Lexington Cnty. Sheriff's Dep't*, 688 S.E.2d 125, 127 n.1 (S.C. 2010) (noting that "under South Carolina law, the sheriff and sheriffs' deputies are State, not county, employees").

While the defendants fairly show that a sheriff and his deputies are, for various purposes, employees of the State, not any given county, that gets them only so far in this case because the definition of "agent" in 18 U.S.C. § 666 is broader than "employee." A person who is an employee of one entity may nonetheless also be an agent of another. Section 666 defines "agent" as "a person *authorized to act* on behalf of another person or a government." 18 U.S.C. § 666(d)(1) (emphasis added); *see also United States v. Pinson*, 860 F.3d 152, 165 (4th Cir. 2017) (per curiam) (noting that an agent under § 666 has been interpreted to include "any person with *authorization to act* on behalf of the covered entity *in some capacity, regardless of the person's official title*" (emphasis added)). And whether a person is an agent turns on "[t]he evidence presented at trial" of the person's relationship

13

to the covered government entity and the person's authority to act on its behalf. *Pinson*, 860 F.3d at 165.

At trial, the government presented evidence that the Sheriff's Office, with prior approval, was authorized to obligate County funds to purchase items, like trucks and body-worn cameras, for use by the Sheriff's Office. Indeed, when Sheriff Underwood occasionally obligated funds *without authorization*, the County Treasurer had to intervene. There was also evidence that Sheriff Underwood was authorized to incur travel expenses from the County under the County's rules. These are examples of the evidence that the jury had before it relating to the authority that Sheriff Underwood and his deputies had, providing evidence that they were "agents" of the County for purposes of § 666. It was for the jury, of course, to make that factual determination, which they did when finding the defendants guilty of violating § 666.

As to § 666's requirement that the County have received $10,000 in federal benefits, the defendants argue that "the government offered insufficient proof." Again, however, this overlooks the evidence before the jury. The Chester County Treasurer testified that during 2017, the County received "about $370,000 in federal grant money," which the County spent on body cameras, 911 equipment upgrades, and a backup generator for the fire department. While the defendants dismiss this evidence, arguing that the grant money was merely a reimbursement for ordinary expenses and thus not a benefit under the statute, *see Fischer v. United States*, 529 U.S. 667, 679 (2000); *Pinson*, 860 F.3d at 167, the evidence showed that the $370,000 was a grant *enabling* the County to purchase items needed for improvements in law enforcement and fire protection. The evidence showed

14

that after Chester County received the grant money, it spent it on body cameras, upgrades to the 911 system, and a backup generator, all of which functioned to improve the County's services to the people and achieve policy goals. *See Fischer*, 529 U.S. at 679 (defining "benefits" as payments for something more than "ordinary course expenditures" that "are made for significant and substantial reasons in addition to compensation or reimbursement"). We conclude that this evidence was sufficient to satisfy the $10,000-benefits element of § 666.

Therefore, we reject the defendants' challenges to their convictions under Count 9 of the indictment.

III

Next, Sheriff Underwood and Lt. Neal challenge the sufficiency of the evidence to support their convictions for depriving Simpson of his civil rights in violation of 18 U.S.C. § 242 by arresting him without probable cause. That section provides, "Whoever, under color of any law, . . . willfully subjects any person . . . to the deprivation of any rights . . . secured or protected by the Constitution or laws of the United States" shall be punished. 18 U.S.C. § 242. Thus, to prove a violation, the government must show that "the defendant (1) willfully (2) deprived another individual of a constitutional right (3) while acting under color of law." *United States v. Cowden*, 882 F.3d 464, 474 (4th Cir. 2018).

The defendants contend that they did not deprive Simpson of his constitutional rights because they had probable cause to arrest Simpson either for disorderly conduct or

15

obstruction of justice. The evidence before the jury, however, was sufficient for it to conclude otherwise.

The primary evidence presented to the jury was the video that Simpson made of the events leading up to his arrest. But there was also the testimony of Fire Chief Frank Culp, who witnessed the events and testified that he did not see Simpson "interfering with the scene," and the testimony of Simpson himself. To the extent that the defendants point to this evidence and characterize it differently, the jury was authorized to make the ultimate factual finding. And we can overturn the jury's verdict only if no reasonable juror could have found the defendants guilty beyond a reasonable doubt. *See United States v. Dennis*, 19 F.4th 656, 666 (4th Cir. 2021).

Simpson's recording, which included both video and audio, showed that Simpson was standing in his yard the entire time that he was recording the events surrounding the automobile accident. While the recording showed a fence at the front of his yard, the grass of his yard nonetheless extended beyond the fence to the curb of the street. Simpson occasionally moved beyond the fence, but he never stepped off or beyond the curb into the street.

Moreover, during the course of the 25-minute video, ending with Simpson's arrest, Simpson did not physically interact with anyone else. Simpson was simply holding his cellphone the entire time, recording the events, narrating them, and occasionally speaking with others, including Sheriff Underwood. As for his dialogue with Sheriff Underwood, the video showed Underwood repeatedly telling Simpson, for his safety, to get on the porch of his house, several yards behind where Simpson was standing. Sheriff Underwood made

16

no statement, however, suggesting that Simpson was interfering with, obstructing, or otherwise adversely affecting the ongoing law enforcement work.  Simpson responded repeatedly to Sheriff Underwood's statements by indicating that he felt safe in his yard. Finally, Sheriff Underwood explained to Simpson that he should get on the porch because Underwood was "doing a manhunt out here," and Simpson complied, albeit slowly.  But as Sheriff Underwood continued his commands to Simpson to get on the porch, Simpson started responding repeatedly, "Now manhunt."  It was when Simpson told Sheriff Underwood, "Do your job!  I'm on the porch," that Sheriff Underwood, apparently now upset by this indignity, moved to Simpson, grabbed him, and told him he was under arrest. At that point, scuffling is heard on the video, as Sheriff Underwood attempted to arrest Simpson, and the video ended.  During the scuffling, Lt. Neal placed handcuffs on Simpson, as testified to by Fire Chief Culp.

The jury could well have construed the evidence to show that Simpson was not arrested because he acted disorderly or obstructed or interfered with law enforcement work. The jury could instead have concluded that Simpson's flippant repetition of "now manhunt" annoyed Sheriff Underwood and caused him to place Simpson under arrest without probable cause that he had committed or was committing a crime.

Lt. Neal argues additionally that the evidence did not show that he acted with the requisite willfulness in violating Simpson's rights because, as he contends, he was only following Sheriff Underwood's order to place Simpson in handcuffs.  He asserts that his good-faith reliance on the reasonable commands of a superior officer deprived the government of proof that his conduct was willful, as necessary for conviction under

18 U.S.C. § 242.  He argues that in instances where such reliance is both in good faith and reasonable, the officer is not aware that what he has done violates any constitutional command because he has reasonably relied on the characterization provided by his superior, citing *Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000).

Lt. Neal's involvement, however, was not as benign as he suggests.  First, he was at the scene witnessing the exchange between Simpson and Sheriff Underwood and Underwood's attempt to arrest Simpson.  In addition, there was evidence that he virtually became an equal partner with Sheriff Underwood in effecting the arrest and removing Simpson from his house and yard.

Fire Chief Frank Culp testified that he witnessed the relevant events, first from the street and then, after Sheriff Underwood and Simpson began to tussle, from a much closer distance, as he entered Simpson's yard to watch.  He explained that, after Sheriff Underwood and Simpson started fighting and Underwood "couldn't get the handcuffs on him, . . . Johnny Neal came over and he helped the Sheriff get the handcuffs on him."  Moreover, after Sheriff Underwood and Simpson got back to their feet, Simpson started "raising Cain" about being arrested, using profanity, and "fussing."  According to Fire Chief Culp, at that point, Lt. Neal

> walked up to [Simpson] and just pushed him as hard as he could, and it pushed him so hard the guy's feet flew up in the air, and when he hit the ground, it sound[ed] like somebody throwing a sack of taters on the ground.
>
> I just knew he done hurt the boy, and so I was kind of waiting to see, you know, if he needed help.  He laid on the ground for at least a minute, maybe two minutes, and then [Sheriff Underwood and Lt. Neal] went over there and helped him back up.  And then after they helped him up, he didn't fuss or

18

cuss or complain or anything anymore.  And then after that, they led him up to, I reckon, a police car.

This evidence does not suggest that Lt. Neal was merely passively following orders; it provides evidence that he was a willful and volunteering participant in the process of getting Simpson away from the scene because he was acting obnoxiously.  But that was not probable cause to arrest him.  A jury could have concluded that this evidence contradicted Lt. Neal's lack-of-willfulness claim, and the jury did just that.

We conclude that the jury had sufficient evidence with which to convict both Sheriff Underwood and Lt. Neal on Count 2, and we reject their arguments suggesting otherwise.

IV

Next, Chief Deputy Sprouse and Lt. Neal challenge the sufficiency of the evidence offered to support their convictions under Count 5 for impeding a federal investigation under 18 U.S.C. § 1519.  Section 1519 provides, "Whoever knowingly . . . conceals, covers up, falsifies, or makes a false entry in any record . . . with the intent to impede, obstruct, or influence the investigation" of an agency of the United States shall be punished.  18 U.S.C. § 1519.  The government charged that the incident report of Simpson's arrest, written by Chief Deputy Sprouse and Lt. Neal, contained two falsehoods and one omission, which, when given to the FBI pursuant to Special Agent Yelk's request, were intended to impede, obstruct, or influence its investigation.  The indictment alleged that the defendants' report (1) falsely stated that Simpson was walking in the road; (2) falsely stated that Simpson used profanities with Underwood prior to his arrest; and (3) omitted the fact that Chief Deputy Sprouse took Ernestine Simpson's cellphone during the search of her house.  The

19

evidence showed that Lt. Neal wrote the first part of the incident report describing Simpson's arrest and Chief Deputy Sprouse wrote the portion relating to the seizure of the cellphone.

Lt. Neal argues that his portion of the report describing Simpson's arrest was not false. The report's statement that Simpson went into the road, he argues, was correct because the video clearly showed that Simpson left his yard and went beyond the fence. And as to the report's statement that Simpson used profanity, Lt. Neal suggests that Simpson's use of "taunts" — repeatedly calling out "now manhunt" — equated to profanity.

While the parties devote substantial attention to whether the strip of land between the fence on Simpson's property and the road was indeed part of the road, this was a factual dispute. The video clearly showed that grass in Simpson's yard extended beyond the fence to the curb of the road and that Simpson never crossed or stepped off of the curb into the road. Also, Fire Chief Culp testified that while he was at the scene, he never saw Simpson enter the road. The jury, which saw the video and heard this evidence, certainly was entitled to resolve this factual dispute against Lt. Neal.

And as to Lt. Neal's argument that Simpson used profanity, Lt. Neal suggests that Simpson's repeated statement, "Now manhunt," was sufficiently taunting for him to call it profanity. As a consequence, he wrote in the report that Simpson "began using profane language and [became] loud and boisterous" and stated "go look for the fu@#ing person y'all looking for then." Lt. Neal's argument that "now manhunt" amounts to profanity was surely for the jury to decide, and it is doubtful that reasonable jurors could conclude that

20

the statement amounted to profanity. Moreover, nowhere in the video is there language even close to what Neal quoted in the report.

As to the report's omission of the seizure of Ernestine Simpson's cellphone, Chief Deputy Sprouse argues that it was immaterial and therefore insufficient to find him guilty under 18 U.S.C. § 1519. The events surrounding the cellphone seizure, however, suggest otherwise. After Chief Deputy Sprouse removed the cellphone from the scene, he gave it to another deputy to take to the Sheriff's Office, but it was never tagged or logged in. And when Special Agent Yelk made repeated efforts to obtain information about the cellphone, demonstrating that it was at least material to her, Chief Deputy Sprouse continued to lie. These events support that the omission of the cellphone seizure from the report was a deliberate attempt to conceal improper police conduct, which was sufficient to support a finding of materiality. *Cf. United States v. Lanham*, 617 F.3d 873, 887 (6th Cir. 2010) ("Material omissions of fact can be interpreted as an attempt to 'cover up' or 'conceal' information").

Finally, Lt. Neal devotes substantial additional argument to his claim that he did not have the mens rea necessary to find him guilty of "knowingly" including falsities in his report about Simpson's arrest. His argument again relies on his claim that in both arresting Simpson and writing the report, he relied on Sheriff Underwood's characterization of the events. There was ample evidence, however, for the jury to have rejected that argument. As noted, there was testimony at trial from Fire Chief Culp that he saw both Lt. Neal and Sheriff Underwood during the entire arrest sequence with Simpson and that Lt. Neal actively participated in the arrest. Moreover, evidence was presented at trial that as early

21

as the night of Simpson's arrest, members of the Chester County Sheriff's Office viewed the video of the arrest, which clearly showed that Simpson used no profanity with Sheriff Underwood before his arrest. Finally, the timing of the incident report's creation — almost two months late and only after the FBI requested it —also supports the jury's inference as to Lt. Neal's mens rea. *See, e.g.*, *United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008) (noting that evidence that an officer was "aware he may have engaged in wrongful behavior" at the time he made a misstatement "provid[ed] circumstantial support for the jury's determination on the intent element").

In short, we conclude that the evidence was sufficient for the jury to have concluded that both Chief Deputy Sprouse and Lt. Neal knowingly impeded the investigation of the FBI by their false statements and material omission.

V

Sheriff Underwood and Lt. Neal also challenge their convictions for wire fraud under 18 U.S.C. § 1343, which were based on their skimming money from the compensation of the deputies who worked at the drunk-driving checkpoints sponsored by the Hazel Pittman Center. While they do not dispute that they defrauded some people, they argue that the indictment required the government to prove that they defrauded the Hazel Pittman Center in particular, which, they argue, the government failed to do. They claim that "[t]he government's premise of the fraudulent scheme was that Neal and Underwood defrauded the Center of money," but they provide no citation for that assertion. Moreover,

22

the argument disregards the plain language of the indictment and fails to account for the evidence offered to support the charge.

The indictment against Sheriff Underwood and Lt. Neal charged a broad scheme, alleging that the defendants devised "a scheme to defraud Hazel Pittman, *Chester County Sheriff's Office employees, and others*, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises." (Emphasis added). And at trial, the government presented evidence showing how the defendants invoiced the Hazel Pittman Center for payment to the deputies manning the checkpoints and arranged to have the Hazel Pittman Center checks deposited in a Detention Center bank account. The evidence also showed how Sheriff Underwood and Lt. Neal manipulated and disguised withdrawals from that bank account, which allowed them to make incomplete or no payments to deputies, ultimately depriving the "Chester County Sheriff's Office employees" of the monies that they earned, as charged. There is simply no merit to the defendants' argument that the scheme alleged in the indictment was focused only on defrauding the Hazel Pittman Center. While the Center was the source of the monies stolen and its purpose was frustrated by the theft, the government both alleged and proved that the actual theft occurred further downstream such that the deputies did not receive what they earned.

Lt. Neal argues additionally that there was insufficient evidence to support the claim that he deposited any of the fraudulent checks at issue *in the bank* and that there was therefore an insufficient nexus between his conduct and the use of "wires," as necessary to support a wire fraud conviction under § 1343. Again, however, he overlooks the evidence

23

at trial. The invoices sent to the Hazel Pittman Center requested that the Center's payments be sent with the notation, "Attention: Lieutenant Johnny Neal." The checks were either so mailed, addressed to Lt. Neal, or he picked them up from the Hazel Pittman Center office. But either way, the checks were then deposited in the bank account that the defendants used in this scheme. Accordingly, we also reject this argument.

VI

Relying on the arguments that they made with respect to the substantive convictions, all three defendants challenge their conspiracy convictions, arguing that if we overturn the substantive convictions, we must also overturn the conspiracy convictions based on them.

Because we affirm the convictions of the substantive crimes, we likewise uphold the conspiracy convictions.

VII

For their final challenge to their convictions, the defendants contend that the district court abused its discretion in admitting certain prior-acts evidence during trial. They challenge the district court's rulings admitting, as intrinsic to the conspiracy charged, evidence showing that Sheriff Underwood (1) directed officers to surveil "breakfast club" meetings of local prominent people in Chester County after a dispute between Underwood and some members of the club regarding the use in schools of resource officers who were not deputy sheriffs; (2) selectively ordered the arrest of the prior sheriff's brother-in-law on drunk-driving charges; (3) ordered deputies to stop a state senator for traffic violations because the senator was involved in suspending Sheriff Underwood's spouse from her

24

position as a state magistrate judge; and (4) directed a deputy to drop drug charges against the son of one of Sheriff Underwood's political supporters after the supporter met with Underwood. They also challenge the court's rulings admitting, for the purpose of showing knowledge and intent — namely, "Underwood's knowledge of the County's procurement policies and intent to violate them" as relevant to the federal-program theft charge — evidence showing (1) that Sheriff Underwood and Chief Deputy Sprouse had flown first class with their spouses to Reno on a work trip on the County's dime, although the County policy prohibited first-class travel and reimbursement of spouses' expenses, and (2) that the Sheriff's Office had acquired items without following Chester County's procurement policies. The defendants argue that the district court's rulings were abuses of discretion, as the court admitted evidence that was neither intrinsic to the conspiracy nor relevant to knowledge and intent. Therefore, they argue, the admission of this evidence violated the restrictions provided by Federal Rule of Evidence 404(b) (regulating the admission of evidence of other crimes, wrongs, or acts). We review these evidentiary rulings for abuse of discretion.

It is, of course, foundational that district courts may admit "relevant evidence" except as otherwise provided by law. *See* Fed. R. Evid. 402. And relevant evidence is that evidence which has "any tendency to make a fact more or less probable" when the fact "is of consequence in determining the action." Fed. R. Evid. 401. Rule 404(b), which is at issue here, provides that "[e]vidence of any other crime, wrong, or act is not admissible *to prove a person's character* in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1) (emphasis added). But the rule

25

goes on to provide that such evidence *is* admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

While Rule 404(b) regulates prior-acts evidence extrinsic to the acts charged in the indictment, it does not regulate acts intrinsic to the conduct charged. *See United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019) (noting that "the provisions of Rule 404(b) are only applicable when the challenged evidence is extrinsic, that is, 'separate' from or 'unrelated' to the charged offense"); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) ("The majority of circuits have held that Rule 404(b) applies only to limits on the admission of other acts extrinsic to the one charged. Under that rule, acts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence"). And we have held that intrinsic acts include, among other things, those that are involved in the "same series of transactions as the charged offense, or [that are] necessary to complete the story of the crime on trial." *United States v. Webb*, 965 F.3d 262, 266 (4th Cir. 2020) (cleaned up). Moreover, in conspiracy cases, we have noted that this means that "the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment." *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004). Indeed, an indictment is not intended to be a summary of all the evidence that the government intends to offer at trial.

For most of the evidence that the defendants challenge, the district court admitted it as intrinsic to the conduct charged. And based on the scope of charges made in the indictment, we conclude that the district court did not abuse its discretion in that regard.

Count 1 of the indictment charged a broad conspiracy of public corruption involving financial corruption, abuse of financial procurements, and abuse of others' rights. It alleged that the object of the conspiracy was the defendants' use of "their positions in the Chester County Sheriff's Office to [1] enrich themselves by obtaining and retaining money and property to which they were not entitled, [2] cover up their misconduct, and [3] obstruct investigations into their misconduct." And describing how the conspiracy was carried out, the indictment alleged, among other things, that the defendants used "their positions as law enforcement officers to intimidate others"; that they took "family members on trips and charg[ed] the cost to the Sheriff's Office"; that they "[e]stablish[ed] a climate of fear within the Sheriff's Office to direct and secure obedience among subordinates"; and that they "[a]buse[d] the rights of others, including [Kevin Simpson]." These allegations readily cover the evidence that the district court admitted as intrinsic to the charges and therefore such evidence was not regulated by Rule 404(b).

The district court admitted the remaining evidence as appropriate prior-act evidence under Rule 404(b)(2), which allows prior-act evidence to show knowledge and intent, in this case, as relevant to the federal-program theft charges. The evidence showed that by deliberately skirting financial controls and rules, the defendants funded a trip and purchased unapproved items for the Sheriff's Office. And it also tended to show that the defendants had the requisite knowledge and intent when they engaged in federal-program theft by "without authority knowingly convert[ing]" deputies' time, and thereby County funds, to their personal benefit in contravention of County policy. 18 U.S.C. § 666(a)(1)(A).

27

In light of the conspiracy and federal-program theft counts, we conclude that the district court did not abuse its discretion in admitting the challenged evidence, either as intrinsic to the charges or for knowledge and intent.

VIII

As to the calculation of restitution for the losses sustained, all three defendants contend that the district court relied on insufficiently reliable information and that its calculation of restitution was therefore unreasonable.

As required by the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, the district court ordered each defendant, jointly and severally, to make restitution in the amount of $24,749.30 to the County for the loss associated with the time deputies were required to work on Sheriff Underwood's property while being paid by the County. The court also ordered that Sheriff Underwood and Lt. Neal make additional restitution in the amount of $5,220 representing the amount stolen from deputies who manned the drunk-driver checkpoints. The defendants do not challenge the restitution amount of $5,220, but they do contend that the calculation of the loss to the County associated with the work performed on Sheriff Underwood's property was unreasonable.

The district court accepted a calculation provided by the government through a detailed chart reflecting the trial testimony of six employees of the Sheriff's Office regarding the work they did at Sheriff Underwood's property, particularly on his barn. The chart showed the employees' hourly rate of income, the estimated hours each employee worked at Sheriff Underwood's property, and the resulting total compensation the County paid them for that time. With respect to salaried employees, the hourly rate was calculated

28

by dividing the employees' weekly salary by 40 to find the per-hour amount. Then to determine the loss attributable to 10 nontestifying employees who were specifically named by testifying employees as having worked on the property, the court relied on the average loss associated with the six testifying employees. Through this method, the court calculated the compensation the County paid for the work of the employees — the six testifying employees and the 10 nontestifying employees — and arrived at the total of $24,749.30, which it required that the defendants pay as restitution.

The defendants contend that the court's calculations are unreasonable, arguing (1) that the total loss to the County associated with the work performed should be reduced for the time that the employees worked on their own time, as opposed to on County time; (2) that for the 10 nontestifying employees, the court should have used the *median* of the losses associated with the testifying employees, not the average; and (3) that the salaried employees' hourly rate should have been computed by dividing their salary by 168 hours, rather than 40 hours, because they were on duty 24/7. Beyond making these objections, however, the defendants do not offer a distinct methodology to calculate the loss.

We conclude that the defendants' objections amount to nitpicking from available alternative methods of calculation that are reasonable. Whether the employees were on County time or on their own time when working on the barn was a matter that the jury decided decisively against the defendants in finding them guilty in the first place. Furthermore, the government made allowance for officers who testified that they were performing work on their own time by not including that work in the calculation. And as to the 10 nontestifying employees, while the court chose to use the *average* of the loss

29

associated with the testifying employees, rather than the *median*, the defendants have failed to show why the average was unreasonable. Finally, while the salaried employees may have been on call 24/7 or 168 hours per week — which are all of the hours in a week — the defendants did not suggest that those employees actually worked 168 hours. They provided no data as to how many hours each did work and why 40 hours was not a reasonable estimate.

It is well established that district courts have "discretion to determine the proper method of calculating the value of lost property," *United States v. Steele*, 897 F.3d 606, 610 (4th Cir. 2018), and that the Mandatory Victims Restitution Act "does not require absolute precision so long as there is a basis for reasonable approximation," *United States v. Manlapaz*, 825 F. App'x 109, 118 (4th Cir. 2020) (per curiam). Moreover, "extrapolation is an acceptable method to use in making a reasonable estimate of loss." *United States v. Johnson*, 368 F. App'x 419, 422 (4th Cir. 2010) (making that observation for a calculation under the Sentencing Guidelines).

We are satisfied that the district court's calculation amounted to a reasonable estimate. Moreover, "once the Government ha[d] satisfied its burden to offer evidence supporting its restitution calculation, the burden shift[ed] to the defendant[s] to dispute the amount with [their] own evidence," which the defendants in this case did not do. *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017). Accordingly, we affirm the district court's restitution orders.

IX

Finally, as to sentencing, Sheriff Underwood contends that the district court, in determining his sentence, erred by relying on acquitted or noncharged conduct. Particularly, he points to statements made by the court during sentencing suggesting that the court was relying on obstruction of justice and false statements convictions, whereas he was actually acquitted on those counts. In particular, he directs our attention to the district court's comment during sentencing where the court stated:

> [A]fter Mr. Simpson's arrest on November 20, 2018, based on evidence presented to the jury, Mr. Underwood and his codefendants *attempted to conceal the unlawful deprivation of Mr. Simpson's constitutionally protected rights by preparing false incident reports, concealing evidence of the crime, and making false statements* to the FBI. At all times during this conspiracy and the unlawful arrest of Mr. Simpson, Mr. Underwood was the duly elected sheriff of Chester County.

(Emphasis added). And he further notes that the district court stated, "It's atypical that a public official would be convicted of deprivation of civil rights, federal program theft, and *providing a false statement to the FBI* at the same time." (Emphasis added).

While Sheriff Underwood does not contend that the district court's referral to false incident reports, concealing evidence, and making false statements to the FBI gave rise to any improper calculation under the Sentencing Guidelines, he argues that this erroneous reference reflected a misunderstanding of the conduct for which he was found guilty, likely influencing the court's refusal to give him a downward variance sentence, as he requested.

We are confident, however, that any error in this regard did not affect Sheriff Underwood's "substantial rights." Fed. R. Crim. P. 52(a). The district court used loose language in articulating the sentence, but a review of the sentencing transcript as a whole

31

demonstrates that it did not base its sentencing decision on acquitted conduct. Immediately before sentencing Underwood, the district court noted as an explanation for the sentence that "you also have a person who is in a high position of trust and has a high-level status . . . and so this case is about the abuse of that particular trust." And the court further observed that it also gave Underwood credit for his acquittal on obstruction of justice stating, "They did not convict on one of the counts, which I believe was the obstruction, and for that reason I sustained the objection to an obstruction count and Mr. Underwood benefited from that because his Guidelines actually became less." Accordingly, we are convinced the district court did not improperly rely on acquitted conduct in determining Sheriff Underwood's sentence, and any error in its brief reference to such conduct was harmless.

*      *      *

For the foregoing reasons, we affirm the judgments of the district court with respect to all three defendants.

AFFIRMED